**Sheilah C. HICKS, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 20240.**

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 16, 1967.

Decided July 7, 1967.

Mr. Richard T. Conway, Washington, D. C., with whom Mr. John R. Kramer, Washington, D. C. (both appointed by this court), was on the brief, for appellant.

Mr. Henry F. Field, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and John H. Treanor, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before BURGER, TAMM and ROBINSON, Circuit Judges.

BURGER, Circuit Judge:

Appellant was convicted of manslaughter and sentenced to prison for a term of two to eight years for killing one Hoyte White, the man with whom she lived. She claims on appeal (1) that an oral admission that she stabbed White was improperly admitted into evidence; (2) that it was improper for the Government in

rebuttal to read from Appellant's subsequent written statement; and (3) that there was not sufficient evidence corroborating Appellant's statements for the case to go to the jury.

Appellant and White lived in a second-floor room of a rooming house. At about 5:00 a. m. on Saturday, March 20, 1965, the police responded to a report initiated by Appellant that there was an unconscious man in her room. They were met by Appellant, who told them she could not rouse White. She told the police that White had arrived home from work Friday evening bleeding from a wound in his chest which he said he had received at the hands of some "jitterbugs" who had jumped, robbed, and stabbed him. The police found White dead in bed with wounds in his chest and jaw. There was a small amount of blood on the undershirt and shorts he was wearing, on the sheet and blanket, and on the floor between the bed and the wall. There was no sign of disorder in the room. The police found White's jacket, which had a hole corresponding with his chest wound, and his overcoat, which had blood on it but no hole.

The police questioned Appellant about White's habits, the route he would have taken home from work, his friends, associates, and debtors and about her own activities that evening. At 6:15 a. m. Detective Cannon sent other officers to verify the place of White's employment, which Appellant had described as a hotel near a stated intersection, and to trace his route homeward.

Cannon told Appellant he intended to take her to the Homicide Squad Office at Police Headquarters to prepare a written report of what she had told them; she was also told she would be taken home when this was finished. Detective Cannon testified that while he generally considers everyone found on the scene of a homicide as a "suspect in a way," he did not consider Appellant a suspect; in short her statements were considered plausible.

On the way to Headquarters with Appellant, the police attempted to locate White's sister and made another stop to buy a package of cigarettes which Appellant requested. They arrived at Headquarters at 6:40 a. m. and went to a private room in the rear of the Homicide Squad Office. Appellant was interviewed and her statement was typed in about two hours, 45 minutes being consumed by interruptions for Cannon to attend to other police business.

Cannon asked Appellant to read and sign the statement if she found it to be accurate. As she started to read it, she said she was "in trouble." Cannon asked what she meant by that and she responded, "Well, it just looks like I am in trouble." He offered her a phone to call a lawyer, assuring her that the lawyer "will tell you that you are a witness and what you are saying is what you know about the man's death." Shortly thereafter she signed. Cannon then offered to provide a ride home as soon as a driver was available. While they were waiting, they talked about a church where Appellant had been the previous evening and with which Cannon was acquainted. In the midst of this conversation, Appellant repeated her fear about being "in trouble," and at 9:05 a. m., she leaned forward and said "Well, I might as well tell you, I stabbed him." Cannon testified that at once he said

> stop right there. I want to tell you right now you are under arrest. You are charged with homicide. You are entitled to the services of a lawyer and a bondsman. You don't have to say anything. If you do, I am going to take it down and it can possibly be used against you. If you can't get your own lawyer, the Court will appoint one.

The District Judge found that Appellant's oral statement had been voluntarily given, and his ruling is not challenged here; he also found "that she was not under compulsion at the time she went down to Headquarters, that she was acting voluntarily and that the inquiries of the police were of a general nature, not

direct at her, not focused upon her * * as a suspect."

### (1) *The Oral Admission*

Appellant argued that her oral admission that she had stabbed White was inadmissible on three alternative grounds: (a) that it was made during an illegal arrest;[1] (b) that if the arrest were legal, it was made during an illegal detention prior to being taken before a United States Commissioner;[2] or (c) that it was the product of custodial interrogation in the absence of requested counsel.[3]

■ The first two claims turn on whether Appellant was under arrest when she left her room or at any point when she was engaged with police in preparing her report of the event. That answer must be found not merely in Appellant's subjective feeling as to whether she was under arrest, but also in the nature of police intentions and actions in all the surrounding circumstances. "To constitute an arrest, there must be an actual or constructive seizure or detention of the person, performed with the intention to effect an arrest and so understood by the person detained." Jenkins v. United States, 161 F.2d 99, 101 (10th Cir. 1947); *accord,* Fisher v. United States, 324 F.2d 775 (8th Cir. 1963), cert. denied, 377 U.S. 999, 84 S.Ct. 1935, 12 L.Ed.2d 1049 (1964). The thought processes of both the police and Appellant, to the extent they can be discerned, are considerations, but

> the test must be not what the defendant * *. * thought, but what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes."

United States v. McKethan, 247 F.Supp. 324, 328 (D.D.C.1965) (Youngdahl, J.), aff'd by order, No. 20,059 (D.C.Cir., Oct. 6, 1966). We reject the claim that a defendant's belief that he was under arrest

is controlling; his subjective beliefs are a factor but they must be considered by the trier along with evidence of his conduct and all the surrounding circumstances.

■ We hold there was ample evidence to sustain the District Court findings and conclusion that no arrest occurred when Appellant was taken to Police headquarters to secure a written statement from her as a material witness in a homicide case. The detective who interrogated Appellant at her home might well have concluded that, apart from the need for transcribing facilities available only at the police office, the room where White lay dead was not conducive to an unemotional recall of all relevant facts.

■■ Advising Appellant they wanted her to come to Headquarters, rather than "requesting" or "inviting" her, does not alter our view. See Hutcherson v. United States, 122 U.S.App.D.C. 51, 53, 351 F.2d 748, 750 (1965); Scarbeck v. United States, 115 U.S.App.D.C. 135, 152, 154, 317 F.2d 546, 563–565 (1962), cert. denied, 374 U.S. 856, 83 S.Ct. 1897, 10 L.Ed.2d 1077 (1963). An assumption that one is required to cooperate with the police can hardly be equated with an arrest; every citizen has a duty to assist police officers up to the point of self-incrimination. The cooperative innocent person would find it oppressive indeed if courts were to hold every person interrogated must first be taken before a magistrate and subjected to the judicial processes applicable to a person criminally charged, i. e., warned that he had a right to maintain silence and to counsel as a preliminary to interrogation.

The next inquiry is whether Appellant came under arrest at the Homicide Squad office before her oral admission. It is undisputed that at no time was Appellant restrained. Appellant's non-incriminating written statement indicates that the

---

1. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

2. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

3. Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

police were treating her as a witness; it discloses that Appellant told the police about White's habits and movements of the previous evening and then answered other questions. In only a minor degree can any of the questions put to her be thought as touching on Appellant's possible involvement; as to these questions she gave exculpatory answers which satisfied the police. After the statement was prepared and Appellant demurred about signing, Cannon explicitly assured her that he considered her only a witness. Appellant at no time made an attempt to leave; she had been promised in advance that she would be taken home by car, and her incriminating statements were made as police were about to fulfill that promise. Here there were none of the familiar concomitants of arrest, e. g., searching, booking, fingerprinting, to negate the statements of police that Appellant was simply being interrogated as an important witness.

■ Seals v. United States, 117 U.S. App.D.C. 79, 325 F.2d 1006 (1963), cert. denied, 376 U.S. 964, 84 S.Ct. 1123, 11 L. Ed.2d 982 (1964), on which Appellant relies, is readily distinguishable from this case; Seals, unlike Appellant, was an acknowledged suspect at all times and the investigation was directed at his part in a robbery;[4] furthermore, he was a high school student. There is ample evidence to sustain the District Court finding and the conclusion that no arrest occurred at any time before her spontaneous oral admission.

■ Appellant's third argument for exclusion is that she requested counsel before making the incriminating statement, that this request was denied, and that *Escobedo* controls. We reject the *Escobedo* contention since no process of police investigation had focused on her, 378 U.S. at 492, 84 S.Ct. 1758; rather the circumstances that police were arranging to send her to her home demonstrates the contrary. Appellant is not aided by the

Supreme Court's explanation in *Miranda* that what it meant in *Escobedo* by "investigation which had focused on an accused" was "custodial interrogation," i. e., "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[5] The investigation here was not initiated by the police but came after Appellant voluntarily reported a homicide; Appellant, not police, set the inquiry in motion. Nor was there any "custodial interrogation" in the *Miranda* sense. Questioning of a witness cannot be characterized as "custodial interrogation" simply because it occurs at a police establishment. Nor is there anything in the record to indicate that Appellant had been deprived of her freedom of action in any significant way; since she never attempted to leave the presence of the police, it cannot be said that her presence at Headquarters was against her will, especially as it is now clear that her conduct and very presence at the police station were part of her attempt to put the police on a wild goose chase in search of the mythical "jitterbug" attackers.

(2) *Use of Appellant's second written statement in rebuttal*

■ Upon changing her story and telling Detective Cannon she had stabbed White and after being promptly warned to remain silent and being advised of her right to counsel, Appellant made another written statement, in which she indicated that she had stabbed White in self-defense after he had slapped her. The existence of this statement came out at the hearing on the motion to suppress, but the Trial Judge stated that he did not want to hear evidence on the circumstances surrounding it since he understood that the Government was not going to use it. The prosecutor stated, however, that he reserved the right to use it in rebuttal, should that prove necessary. The

4. Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (U.S. April 25, 1967), is similarly inapposite.

5. Miranda v. State of Arizona, 384 U.S. 436, 444 n. 4, 86 S.Ct. 1602, 1612, 16 L. Ed.2d 694 and accompanying text (1966).

defense attorney evinced no interest in challenging the admissibility of the statement.

When the Government introduced evidence of Appellant's oral admission, defense counsel complained that by not introducing the later written statement the Government was omitting exculpatory explanations. He stated to the Trial Judge that he intended to quote verbatim from two paragraphs and ask Detective Cannon whether Appellant had made those statements. The Court explained that if he did so the whole statement could come in. Defense counsel replied, "Well, then, I will take my chances," and subsequently agreed to the Court's statement that permitting defense counsel to cross-examine from the statement was with the understanding that the Government could fill in the gaps if it desired. Defense counsel's cross-examination of Cannon included, among other questions, whether Appellant had stated she stabbed White only after being attacked by him. Cannon answered that she had. When the Government sought to ask him to read from other parts of the statement, defense counsel objected to the use of the statement although his cross-examination had been based on its contents.

Having thus opened up this line of inquiry, the defense cannot be heard to complain that the Government pursued it, even assuming its inadmissibility as part of the Government's case. Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954); Johnson v. United States, 120 U.S.App.D.C. 69, 70, 344 F.2d 163, 164 (1964); Crawford v. United States, 91 U.S.App.D.C. 234, 198 F.2d 976 (1952).

### (3) *Corroborative Evidence*

 We find no merit in Appellant's argument that there was not sufficient evidence corroborative of Appellant's statements for the case to go to the jury. Decedent's body supplied evidence of the *corpus delicti* and the bloody clothing rent by knife thrusts constituted an *abundance* of corroboration.[6]

Affirmed.

---

6. Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable. A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. See 7 Wigmore, Evidence (3d ed. 1940), § 2072, n. 5. *There need in such a case be no link, outside the confession, between the injury and the accused who admits having inflicted it.* Wong Sun, *supra* note 1, 371 U.S. at 489–490 n. 15, 83 S.Ct. at 418 (emphasis added), and text pp. 488–490, 83 S.Ct. pp. 417–419; Smith v. United States, 348 U.S. 147, 153–154, 75 S.Ct. 194, 99 L.Ed. 192 (1954).