UNITED STATES of America

v.

David E. CLARK.

Crim. No. 605–66.

United States District Court
District of Columbia.

June 17, 1968.

Seymour Glanzer, Asst. U. S. Atty., Washington, D. C., for the United States.

John Perazich, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GASCH, District Judge.

Pursuant to an order of the United States Court of Appeals for the District of Columbia, filed March 21, 1968, this Court held an evidentiary hearing in the above-captioned case to augment the trial record with respect to those points enumerated in the remand order. At this hearing, held May 13, 1968, the Court heard the testimony of the following witnesses: Mr. Frank Alberstadt, Mr. Lenard G. Kragh, Lt. Alexander P. Fury, Mrs. Jessie B. Clark, Det. Martin J. Hannon, Det. James K. Kelly, and the defendant David E. Clark. Having considered the totality of the testimony elicited, and having weighed the inconsistencies in the testimony with the Court's evaluation of each witness, the Court will proceed to render its findings of fact and conclusions of law, in the order indicated by the Court of Appeals.

(1) *Time, place, circumstances and legality of appellant's arrest.*

Sometime in the mid-afternoon of Sunday, March 6, 1966, between 2 and 3 o'clock in the vicinity of Logan Circle in northwest Washington, Det. Martin J. Hannon, awaiting the return of Det. James K. Kelly, observed the defendant on the street. He had previously met the defendant at 14th and U Streets, N. W., one day in the preceding month, and believing at that time the defendant was wanted in connection with a matter unrelated to the instant case, had arrested him. When it became apparent that defendant had been mistakenly arrested, Det. Hannon apologized and in the company of Det. Bracey, drove the defendant to his place of employment, the dining room of the Westchester Apartment complex. Upon arriving at the Westchester, Hannon, Bracey, and the defendant engaged in extended conversation over dinner, which conversation included some discussion of the defendant's troubles with narcotics. Det. Bracey offered to put defendant in touch with a clergyman who he felt could be of some help to the defendant.

When Det. Hannon saw defendant near Logan Circle on March 6, he inquired of him as to why he had not called Bracey about his narcotics problem and offered to drive defendant down to the Metropolitan Police Robbery Squad so that further steps might be taken to bring defendant and the clergyman together. As Det. Kelly had not returned to the car, Hannon and defendant engaged in further conversation about guns, a subject of interest to the defendant Clark. Hannon offered to allow defendant to look at a book maintained by the Robbery Squad

devoted to this subject. In addition, defendant volunteered the information that he knew of a house nearby where one "Dog" had been filing serial numbers off guns and further that "Dog" and his wife "Vicky" had been dealing in narcotics at this address. When Det. Kelly returned to the car, the three men drove to the Robbery Squad, detouring past a house pointed out by defendant as being the residence of "Dog." The Court notes that defendant, consistent with the testimony of the officers, admitted this detour but claimed that its purpose was to point out the house where an acquaintance, Jerry *Bog,* had threatened suicide. While the defendant steadfastly denies agreeing to accompany the detectives to the Robbery Squad, the Court finds that he did in fact do so. Det. Hannon had in mind the dual purpose of checking out defendant as a suspect in the instant case and then attempting, if possible, to use defendant, whom he knew to be acquainted with a segment of the city's criminal element, as a police agent, defendant having volunteered the information concerning "Dog." The testimony of Det. Hannon and defendant is absolutely irreconcilable on the matter of defendant's voluntary agreement to come to headquarters, but the Court notes that at no time until he was identified by Mr. Alberstadt did defendant communicate any desire to any other person either to refrain from coming to the Robbery Squad or to leave once he was there.

During the 1–1½ hours that defendant spent at the Robbery Squad prior to being identified by Mr. Alberstadt, he was permitted to look at the gun book, and engaged in conversation by the officers present. He spoke with Det. Bracey on the telephone and began a like conversation with his mother. All of the testimony indicates that defendant was not under any form of spoken or unspoken restraint, but rather that the atmosphere was essentially informal and that no restraint was imposed.

In the meantime, without notifying the defendant, Det. Hannon had requested Mr. Alberstadt, the victim of the robbery in the instant case, to come to the Robbery Squad to view a suspect. This call was made after the arrival of Hannon, Kelly and the defendant. Upon his arrival, at about 4:30 that afternoon, Mr. Alberstadt accosted and identified defendant. Immediately thereafter defendant was arrested.

The Court finds that to some extent, Det. Hannon perpetrated a ruse on defendant in securing his presence for purposes of identification by Mr. Alberstadt. However, as defendant was not under restraint at the time, this ruse is of no consequence. See United States v. Chibbaro, 361 F.2d 365 (3rd Cir. 1966).

In arguing that he was under arrest prior to the identification by Mr. Alberstadt, defendant places great reliance on his subjective opinion of his status at the Robbery Squad. Defendant recognizes not only that subjective beliefs are not necessarily controlling, Hicks v. United States, 127 U.S.App.D.C. 209, 382 F.2d 158 (1967), but also that the Court should consider "what a reasonable man, innocent of any crime, would have thought had he been in the defendant's shoes," United States v. McKethan, 247 F.Supp. 324, 328 (D.D.C. 1965), affirmed by order (D.C.Cir. No. 20,059, 1966). The Court concludes, upon consideration of these circumstances of defendant's presence at the Robbery Squad, that the "reasonable man" in *McKethan* would not have considered himself under restraint, and moreover that the words and conduct of Det. Hannon and his fellow officers demonstrate the actual absence of an arrest status. Defendant demonstrated an unduly suspicious nature through his unsubstantiated assertions that he was viewed by many others on Sunday, March 6, but more importantly, by his own testimony, convinced the Court that he himself did not consider himself under arrest that afternoon before being identified by Mr. Alberstadt. Defendant's demeanor makes it adequately clear that he is not the type of man who would be intimi-

dated into putting up with a situation with which he is not entirely satisfied. However, he made no effort to enlist the aid of his mother or the attorney who had represented him in prior involvements with the law. If he had considered himself under arrest at the time, it is reasonable to expect that he would have sought assistance promptly either from his mother or his attorney. Defendant's call to his mother, placed immediately before the arrival of Mr. Alberstadt, did not become a call in the nature of a request for assistance until after he knew that he was about to be identified by the victim of the crime. Having observed the defendant testify both at trial and at the remand hearing, the Court is convinced that some form of vocal or physical restraint would have been necessary to hold David Eugene Michael Clark at the Robbery Squad had he not been there of his own free will. There is no evidence of any such restraint.

■ Having found that defendant voluntarily accompanied detectives Hannon and Kelly to the Robbery Squad and that he was not under restraint while there, and having further found that defendant was not arrested until immediately after his identification by Mr. Alberstadt, the Court concludes as a matter of law that defendant's arrest was lawful and upon probable cause shown to the arresting officer that he had committed the armed robbery of Arena Liquor on February 14, 1966.

(2) *Circumstances surrounding the pre-trial identification of appellant by the witness Alberstadt.*

The circumstances surrounding defendant's presence at the Robbery Squad have been fully explored in (1). With regard to the identification incident itself, the Court makes the following findings:

On the night of the robbery, the witness Alberstadt was shown a number of photographs at police headquarters, including loose pictures in a book and slides projected upon a wall. He was able tentatively to identify defendant, conditioning any definitive identification upon seeing the man in person. There is no indication that the viewing of these photographs was anything but the initial step in a routine police investigation nor did it play any part in the subsequent identification of defendant by Mr. Alberstadt. Indeed his memory of the pictures is vague, while he was able to recall in some detail the incident at the Robbery Squad on March 6. In addition, he was not informed of any connection between the picture he had tentatively identified and the suspect he was to view on March 6.

On Sunday, March 6, 1966, he returned a call from Det. Hannon who asked him to come down promptly to the Robbery Squad to view a suspect. Arriving at the Squad room, he entered and saw the defendant seated behind a desk talking on the telephone. Defendant was attired neatly in a white shirt, dark long sleeved cardigan sweater, gray trousers and brown shoes. Nothing was said by anyone to Mr. Alberstadt. Det. Hannon who had called him did not see him arrive. Mr. Alberstadt was not aware of where in the room the "suspect" he was to view would be nor did he know that the suspect was to be in the Squad room. He testified that he expected to be taken to a cell to view the suspect. Upon seeing the defendant, the witness Alberstadt hurried toward him, paying little attention to others in the room. Enraged, he scuffled with defendant and was restrained by the officers present.

Present in the Robbery Squad room when Mr. Alberstadt entered were a number of detectives, a majority of whom were white. This number was variously approximated by the witnesses and the Court finds that it was between six and eight. These officers were dressed in normal business attire, some having their coats off and ties loosened. At least one detective present, Mark Gray, who is white, was nearly as tall as the defendant and others were over 6 feet. Defendant is white, 6 feet 4 inches, and of slender build. The atmosphere in the room was

casual, many officers catching up on paper work. Some were seated, some were standing engaged in conversation. The desk at which defendant was seated was on Alberstadt's left as he entered the room, about four desks from the front. Defendant was seated in the prime desk chair, and not in the metal chair alongside customarily used for interviewing suspects and witnesses. After the excitement of the identification had passed, the witness Alberstadt was able to identify others in the room as police officers because of the visibility of their weapons. The Court does not adopt the testimony of the witness Alberstadt concerning his ability to see the weapons of all officers present, as some had their coats on.

The Court further finds that the identification of defendant by Mr. Alberstadt was spontaneous in nature, in that no directions were given to him upon his arrival. The witness was surprised and angry at seeing defendant seated behind the desk and being accorded the privileges of his freedom. The Court also finds that Mr. Alberstadt thought there was "a pretty good chance" that he would see the man who had robbed him that day, although he was told nothing about the suspect he was to view.

(3) *Admissibility of evidence of pretrial identification by the witness Alberstadt.*

■ Defendant has argued at length that his identification by the witness Alberstadt was the fruit of an illegal arrest and as such should be suppressed. The Court having found that defendant was not arrested until immediately after his identification by Mr. Alberstadt on March 6, this argument is not of significance.

■ The primary issue involved in determining the admissibility of pre-trial identification is whether the identification procedure followed was "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to amount to a denial of due process of law. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), establish a right to counsel at pretrial confrontations but have not been applied retroactively.[1]

■ The thrust of *Stovall* is primarily toward single suspect confrontations wherein a witness is presented with one individual and asked if he can make an identification. It is clear that the possibility of such a procedure amounting to unfairness violative of due process must be examined in light of the totality of the surrounding circumstances.[2] The Court has considered this issue in other caes, and in United States v. O'Connor, 282 F.Supp. 963, 965, outlined some tests to be applied to confrontations between witness and suspect in determining the impact of the Stovall decision upon a particular case. These tests are as follows:

1. Was the defendant the only individual that could possibly be identified as the guilty party by the complaining witness, or were there others near him at the time of the confrontation so as to negate the assertion that he was shown alone to the witness?

2. Where did the confrontation take place?[3]

3. Were there any compelling reasons for a prompt confrontation so as to deprive the police of the opportunity of

---

1. Stovall v. Denno, 388 U.S. 293, 296, 87 S.Ct. 1967, 18 L.Ed.2d 1199; Wright v. United States, 404 F.2d 1256, at p. 1259 (D.C.Cir. Jan. 31, 1968) and authority cited therein.

2. *Stovall,* supra, at p. 302, 87 S.Ct. 1967; *Wright,* supra, at p. 1259.

3. Wise v. United States, 127 U.S.App. D.C. 279, 383 F.2d 206, 210 (1967). See also footnote 2 of Judge Bazelon's dissent in *Wright,* supra, at p. 1262.

securing other similar individuals for the purpose of holding a lineup? [4]

4. Was the witness aware of any observation by another or other evidence indicating the guilt of the suspect at the time of the confrontation?

5. Were any tangible objects related to the offense placed before the witness that would encourage identification? [5]

6. Was the witness' identification based on only part of the suspect's total personality? [6]

7. Was the identification a product of mutual reinforcement of opinion among witnesses simultaneously viewing the suspect?

8. Was the emotional state of the witness such as to preclude objective identification?

9. Were any statements made to the witness prior to the identification indicating to him that the police were sure of the suspect's guilt?

10. Was the witness' observation of the offender so limited as to render him particularly amenable to suggestion, or was his observation and recollection of the offender so clear as to insulate him from a tendency to identify on less than a positive basis?

■ Applying these and other tests to the totality of the circumstances surrounding the identification of defendant by the witness Alberstadt at the Robbery Squad, the Court concludes that the events which there transpired were not so unnecessarily suggestive and conducive to mistaken identification as to amount to a violation of due process of law. The defendant was not shown alone to the witness; rather he was in the company of other adult white males who, when it is remembered that defendant was seated at the time, were of comparable size. While defendant did not have on a necktie, his neat attire, comparable to the dress of others present, was not significantly outstanding or different as to label him as the suspect Alberstadt had been called to view. The confrontation took place in the Robbery Squad room but whatever suggestive atmosphere existed there was more than outweighed by the fact that the witness did not expect the suspect to be on view there and particularly did not expect to see a suspect in the armed robbery of his store sitting in a detective's chair behind a detective's desk talking on a detective's telephone.

■ As defendant was not in custody at the time of the confrontation, he could not have been forced to participate in a lineup had Det. Hannon sought to set one up. Mr. Alberstadt had been asked to appear promptly, probably due to Hannon's apprehension that defendant would become impatient and leave. It may be that upon the tentative photographic identification of defendant he would have been subject to custody, but the Court concludes that the failure of the officer to hold a lineup in these hurried circumstances does not amount to a denial of due process.

Further, the witness Alberstadt was aware of no evidence, tangible or intangible, linking the suspect he was to view with the crime. He was unaware of any connection between the photograph he had tentatively identified and the suspect. Obviously his identification was not the product of any mutual reinforcement of opinion; rather it was spontaneous and clearly unprompted. While defendant makes much of the emotional state of Mr. Alberstadt on the day in question, the Court concludes that his anger and excitement stemmed primarily from encountering the man who had robbed him and arose for the most part immediately after the witness recognized Clark. Thus it has little bearing on the issue of irreparable mistaken identity.

Finally the Court notes that the "confrontation" that took place between de-

---

4. See *Stovall*, supra, note 1, at 302. 302, 87 S.Ct. 1967.

5. See Palmer v. Peyton, 359 F.2d 199, 201 (4th Cir. 1966).

6. Ibid.

fendant and the witness Alberstadt on March 6, 1966, was not the type of confrontation under consideration in the *Stovall* opinion. Mr. Alberstadt was not shown one suspect and asked "Is this the man?" Conceivably such a procedure was the ultimate plan of Det. Hannon, but it was never consummated. The witness' sudden and unprompted identification of one who would ordinarily be taken as an employee or at least a social visitor of the Robbery Squad refutes the allegation of any suggestion and eliminates the question of this event having been "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to amount to a denial of due process of law.

■ Having found that the events of March 6, 1966, were not unnecessarily suggestive, the Court concludes that this pre-trial identification of defendant by the witness Alberstadt was admissible in evidence. However, the Court notes that Government counsel during the trial did not seek to bolster his case by placing before the jury the witness' prior identification. On direct examination, Mr. Alberstadt simply stated that he saw the defendant at police headquarters. It was only after cross-examination had begun that the jury became cognizant of the fact that the witness had been able to identify defendant on a prior occasion.

(4) *Admissibility of courtroom identification by the witness Alberstadt.*

■ Wright v. United States, supra, note 1, makes it clear that even when a pre-trial confrontation has exceeded the bounds of *Stovall* the Government may nonetheless ask a witness to identify the defendant in court before the jury if it can show "by clear and convincing evidence" that the proffered in-court identification has an origin independent of the witness' observations during the challenged confrontation. As the Court has found that the pre-trial identification of defendant Mr. Alberstadt did not exceed the bounds of *Stovall,* it is unnecessary

to further explore the origin of his in-court identification.

However, the evidence disclosed at the trial and subsequent remand hearing demonstrates clearly and convincingly that the witness Alberstadt based his in-court identification not on the events of March 6, 1966, but rather on what transpired at the Arena Liquor Store at the time of the robbery. The witness was able to give a good description of the offender to police immediately after the offense and was able to tentatively identify defendant from photographs that same night. His opportunity to view the robber at the Arena Liquor Store was excellent.

■ The Court concludes that the in-court identification of defendant by the witness Alberstadt was admissible, not having been preceded by any suggestive confrontation, and having been shown by clear and convincing evidence to have an origin other than the events of March 6, 1966.

(5) *Circumstances surrounding the pre-trial identification of appellant by the witness Jones.*

Having heard and considered the testimony of the witnesses James Jones, Det. Hannon, and the defendant, the Court makes the following findings with regard to the circumstances of the pre-trial identification of defendant by Jones:

On Monday, March 7, 1966, the witness Jones was told to report to headquarters by his employer Mr. Alberstadt. He arrived some short time after 8:00 A.M. and was escorted by Det. Hannon to a detention area behind the room where line-ups are conducted. Det. Hannon asked him to look around and see if he could identify anyone present. In a cell with approximately ten Negroes and two other white males, he saw defendant seated. The witness asked that defendant come closer and defendant stood and approached the edge of the cell. At that time the witness Jones

positively identified defendant as the robber of the Arena Liquor Store.

All of the persons present in the cell were dressed in the clothes in which they had been arrested. Det. Hannon gave no information to the witness concerning which man in the cell was the suspect; however, the fact that most of the other prisoners were Negroes is significant.

At the time he went to headquarters that Monday morning, Mr. Jones was aware that his employer had identified a man the day before, but not that that individual was among the men in the cell. Like Mr. Alberstadt, Mr. Jones had tentatively identified defendant from a number of photographs the night of the robbery, but was not told that the man he had tentatively identified was among those in the cell. There being a conspicuous unavailability of detailed evidence on the exact description of the other white males in the cell at the time, the Court makes no findings in this regard.

(6) *Admissibility of evidence of pre-trial identification by the witness Jones.*

The issues here presented are essentially those considered in (3). The same case law and the same tests are applicable. Applying these tests to the circumstances surrounding the pre-trial identification of defendant by the witness Jones, the Court concludes that this procedure exceeded the bounds of Stovall v. Denno and was "unnecessarily suggestive" under what seems to be the prevailing interpretation of that phrase in the District of Columbia.[7]

There is and always will be insufficient evidence to find that defendant was then in the company of others comparable in appearance. The witness Jones is unable to recall exactly what statements were made to him by his employer before he left for headquarters that morning. Unlike the previous day, defendant was shown to the witness in a cell and was a natural object of scrutiny as a possible suspect. Since defendant was already in custody, and being held in the line-up area, it appears that Det. Hannon should have been able to delay the confrontation in order to fashion a better test of the witness' ability to identify defendant. Of course, no affirmative suggestive influences such as tangible or intangible evidence connecting defendant with the offense were present, nor was there an verbal reinforcement of the witness Jones' opinion from Det. Hannon or other witnesses. In addition, the witness Jones had already made a tentative identification of defendant, indicating that his recognition of Clark was not the product of suggestion.

However, the Court's conclusion that the headquarters identification of defendant by the witness Jones was not the product of suggestion does not directly bear on the issue of whether the jury may be told of such identification. The natural inference that the jury might be expected to draw when presented with a prior identification is that the identifying witness has always been sure of the identity of the offender and that the pre-trial confrontation, being essentially another test of the witness' recollection, is probative of the defendant's guilt. If the challenged confrontation is suggestive, and as such not a good test of the witness, the jury should not be permitted to hear of the confrontation and draw this inference.

Upon weighing the circumstances, the Court concludes that the pre-trial confrontation of defendant by the witness Jones was suggestive to the extent of being inadmissible in evidence as part of the Government's case.

As with the witness Alberstadt, the Court recalls that Government counsel did not seek to fortify his case with the pre-trial identification of defendant by the witness Jones. No reference at all was made to the Monday confrontation until cross-examination had begun. The Court is of the opinion that if for tactical reasons, defense counsel chooses

7. *See generally Wright*, supra, note 1.

to place before the jury an allegedly prejudicial confrontation, the Government should be permitted to defend the testimony of its witnesses by seeking to convince the panel of the unsuggestive nature of the challenged confrontation.

(7) *Admissibility of courtroom identification by the witness Jones.*

The issues before the Court here are essentially those considered in (4). The Court having determined that the pre-trial confrontation of defendant by the witness Jones was unnecessarily suggestive and thus inadmissible in evidence, the Government has the burden of demonstrating by clear and convincing evidence that the in-court identification of defendant by the witness Jones had an origin other than the events which transpired on Monday, March 7, 1966. Upon consideration of the testimony elicited both at trial and at the remand hearing, the Court concludes that the Government has met this burden.

James Jones was present during the entire robbery and viewed the offender under the same advantageous conditions as did his employer. Lighting conditions were favorable to a good identification and the robber wore no mask which would conceal his memorable facial features. Mr. Jones, as did Mr. Alberstadt, recalled clearly the unusually colored and deep set eyes of the robber.

Moreover, the witness Jones was able to tentatively identify defendant from a number of photographs on the very night of the robbery when his recollection would be at its best.

These facts and the assertion of the witness that his identification was in no way influenced by his observation of defendant in the cell on March 7 provide clear and convincing evidence that the pre-trial confrontation between James Jones and David Clark was not the basis of the witness' courtroom identification. The Government having met its burden of showing by such evidence that Jones' in-court identification of defendant had a source independent of the confrontation, the Court concludes that said identification was admissible.

