UNITED STATES of America, Plaintiff,

v.

Alves Madeline BIRD, Defendant.

Crim. No. 9507.

United States District Court
D. Montana,
Havre-Glasgow Division.

Dec. 16, 1968.

Moody Brickett, U. S. Atty., Butte, Mont., and Arthur W. Ayers, Jr., Asst. U. S. Atty., Billings, Mont., for plaintiff.

Michael J. Whalen, Billings, Mont., for defendant.

## ORDER AND OPINION

JAMESON, District Judge.

At the close of the Government's case and again at the close of all evidence, the defendant made a motion for a judgment of acquittal. The court reserved decision on the second motion and submitted the case to the jury, which returned a verdict of guilty of voluntary manslaughter. The motion for judgment of acquittal thereafter was renewed by the defendant, briefs were filed by the respective parties, and oral argument was presented on December 2, 1968.

The question for determination is whether the court erred in denying defendant's motion to suppress an oral statement given by the defendant to Thomas E. Saunders, Special Agent of the Federal Bureau of Investigation.[1] It is conceded that without this statement there was insufficient evidence to permit the case to go to the jury.

In determining (1) whether the defendant was properly interrogated after expressing a request to remain silent and (2) whether she made a voluntary and intelligent waiver of her privilege against self-incrimination within the Miranda rules[2], it is necessary to review in some detail the evidence relating to the circumstances under which the statement was given.

Alves Bird, a 44 year old Indian woman, with an eighth grade education, had been living with Sam Daniels in a common law relationship for 12 years. They had five children.

On June 21, 1968, Alves and Sam started drinking at the home of Calvin Melbourne in Brockton, Montana, about 8:00 P.M. Later they went to the Log Cabin Bar. Viola Lambert, a Government witness, testified that she went to the bar about 11:00 P.M. and left just before 1:00 A.M. Alves and Sam were there when she arrived and when she left. They had been drinking and were argu-

---

1. A separate hearing was held on the issue of voluntariness of the confession, after which the court submitted the issue to the jury. It is recognized that under Jackson v. Denno, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, the defendant is entitled to have an independent determination of this issue by the trial judge. "The trial judge's resolution of the issue is 'preliminary' in the sense that it precedes the submission of the same issue to the jury, but it is in no sense a partial, limited or tentative determination. On the contrary, it is the primary determination of the issue of voluntariness; it is the determination required by the Constitution". Javor et al. v. United States, 9 Cir., 403 F.2d 507, decided November 14, 1968.

2. Miranda v. Arizona and related cases, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694, 10 A.L.R.3rd 974.

ing. "Alves appeared to be drunk".[3] Wilma Melbourne, another Government witness, testified that she arrived at the bar about 12:30 and left about 1:00 o'clock, and that Alves and Sam were there when she arrived and when she left.

Alves and Sam continued quarreling after they returned home. Alves' daughter Emily recalls hearing her mother tell Sam to "get the hell out of the house" and that she told both Alves and Sam to behave themselves.

At 4:30 A.M. Vernon L. Erickson, juvenile officer of the Bureau of Indian Affairs, found Alves sitting on the steps in front of her home with Sam's head in her lap. Sam was apparently dead at that time. It was established that he died from a stab wound in the heart and that the stabbing occurred some time before the death. Richard Feather walked by the Daniels' home some time after the bar closed, presumably after 2:00 A.M., heard Sam moaning in the front yard of his home, and was informed by Sam that he had been stabbed. Although Feather asked him two or three times who did it, Sam did not answer. It is clear that Sam was stabbed by someone at some time after 1:00 A.M. and was in front of the home for a considerable period of time prior to 4:30 A.M.

The testimony of the defendant herself regarding the times of various happenings is unclear and in many instances does not coincide with the facts. It does appear that after Sam left the house, Alves spent a part of the night smoking and drinking tea and cooked some soup. There is no evidence that she went to bed at any time or had any sleep the night of the 21st or morning of the 22nd.

Clarence L. Thompson, Special Officer of the Bureau of Indian Affairs, arrived at approximately 5:30 A.M., with Robert Murray, Chief of Police at Poplar and Deputy Sheriff of Roosevelt County. Erickson and Bert Eder, tribal patrolman, were already there.[4] Thompson talked with the defendant briefly but did not have any information that defendant was implicated in Sam's death. He asked Alves and Emily to accompany him to the Law and Order office in Poplar (13 miles from Brockton) for an interview as possible witnesses. They agreed and were taken to Poplar by Thompson and Murray in Thompson's government car.[5] They arrived at the Law and Order office at 6:55 A.M.

A formal interview was instituted at that time. At the beginning of the interview Thompson had no information that would implicate Alves in Sam's death. Murray was present during the interview. After approximately 30 minutes, Thompson "was called out" by Patrolman Eder. He received information from Eder "contrary to that furnished" by the

---

3. Clarence L. Thompson, Special Officer for the Bureau of Indian Affairs, testified that at the time of his interview with the defendant, which began at approximately 6:55 A.M., she was not intoxicated and at that time there was no evidence she had been drinking, but that he "had merely an impression earlier she had, upon my arrival at the scene".

4. Apparently Erickson, Eder, Thompson and Murray all participated in the on-the-scene investigation.

5. Thompson testified as follows with respect to his request to Alves and Emily that they accompany him to the Law and Order office:

"Q When you made this request what was the response first of Emily Bird?

"A Emily did not say anything, as I recall, and then Alves asked would we be gone long, because Emily was pregnant.

"Q What did you say?

"A I told her as soon as we finished up the interview we would get her back down.

"Q Was there any particular reason for wanting to go to Poplar?

"A Yes. It would have been much easier to interview there with the other officers working the scene, and it was not a particularly good situation to try to interview in there, with the activities."

defendant. At the hearing to suppress the statement, Thompson testified:

"Q And what did you do as a result thereof?

"A Well, the information I received, I went back into the room, I informed Alves I did not believe she had been telling me the truth at this time. At this time *I advised of her right to remain silent, that it was indicated to me she may be mixed up into this,*—This was from the information that had been furnished by Patrolman Eder. She had a right to an attorney and she did not have to tell me anything if she did not wish to.

" * * *

"Q You said you came in and interviewed her. After you had initially talked to Patrolman Eder you went back in and advised her of certain rights?

"A Yes.

"Q Did you interview her at that time?

"A I attempted to.

"Q Would you explain that please?

"A Well, she denied having any knowledge or participating in what had occurred.

"Q Is this the point you were talking about when you say the interview was terminated?

"A Yes.

"Q And what happened at that time?

"A Alves went outside of the room and I asked Emily to come in, and talked to Emily.

"Q When Alves went out of the room was she in custody of any kind?

"A No, sir.

"Q As far as you were concerned was she limited to staying in the Law and Order Office?

"A No, sir.

"Q Or any other particular area?

"A No, sir.

"THE COURT: She was a suspect at this time?

"A At this time she was a suspect, yes.

"BY MR. AYERS:

"Q Would you tell us what information you did have, even though second hand, that might make her a suspect at that time?

"A Yes, sir, the fact that the information had been collected by Patrolman Eder that Alves was seen in the Brockton Bar late during the late opening hours of the bar arguing with Sam, and on the interview with Alves she told me she had not seen him since he left home at 7:30 P.M.

"Q Was this all the information you had?

"A At that time, yes.

"Q Concerning her possible involvement?

"A Possible involvement, yes."

On cross-examination Thompson testified:

"Q When did you say it was that you advised her of her rights?

"A This would have been on the first interview, and near the end of the first interview when I was interviewing Alves.

"Q And were you becoming suspicious of her at that time?

"A Not until I had been called out of the room by Patrolman Eder.

"Q But when you advised her of her rights you were becoming suspicious of her, is that right?

"Yes, sir, I was.

"Q This was prior to the termination of the first interview?

"A Just prior to the termination, yes, sir.

"Q And would you tell us please whether or not her rights were written out on some kind of card or paper?

"A We do have forms prepared, but one was not exhibited to her at this time. *I merely informed her of her rights to remain silent, she had a right to an attorney. She denied in-*

*volvement and stated she did not want to talk about it any more, and the interview was terminated.*

"Q  She stated she did not want to talk about it any more?

"A  *She stated she did not wish to discuss it.*"  (Emphasis added.)

Shortly after Thompson's interview terminated, an interview was instituted by Thomas E. Saunders, Special Agent of the Federal Bureau of Investigation. This lasted from 7:25 until 7:40. Between 7:40 and 8:31 A.M. Saunders interviewed Emily, who implicated her mother. Saunders then resumed his interview of Alves, his log showing that he began advising of her constitutional rights at 8:33 and began the second interview at 8:36. This continued until 9:15 A.M. In the first interview Saunders interviewed Alves "as a witness" and in the latter interview as a "suspect".

At the outset of the second interview Saunders advised Mrs. Bird regarding her constitutional rights and had her read aloud to him a form customarily used by the F. B. I. entitled "Your Rights".[6] The form also contains a "Waiver of Rights", which is usually signed by the person interrogated. This was not signed by Mrs. Bird and the form contains the following notation: "Not going to sign".

Saunders testified that Mrs. Bird "did not experience any difficulty in reading" the form. He testified further:

"Q  Did she read the part which is designated 'Waiver of Rights?'

"A  Yes, she did.

"Q  Did you ask whether or not she would sign it?

"A  I did.

"Q  And what was her response?

"A  She said 'I am not going to sign.'

"Q  And what else?

"A  Well, then I asked her if she wanted to talk to us anyway knowing —without having a lawyer present, and she agreed.

"Q  And did she thereafter make a statement?

"A  Yes, she did."

At the suppression hearing, in response to the question "Why did you let them question you", the defendant answered, "Because I thought maybe I had to". Her testimony regarding the advice she received concerning her rights and the waiver form is uncertain. She testified in part:

"Q  When you were questioned the first time do you remember if anybody

---

6.  This document, received in evidence as plaintiff's exhibit 5, reads:

"YOUR RIGHTS

| Place | Poplar, Mont. |
|---|---|
| Time | 8:33 A.M. |
| Date | 6/22/68 |

"Before we ask you any questions, you must understand your rights.

"You have the right to remain silent.

"Anything you say can be used against you in court.

"You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning.

"If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.

"If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

"WAIVER OF RIGHTS

"I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

                    "Signed 'Not going to sign.'

"Witness <u>Thomas E. Saunders</u>, Special Agent F.B.I. 6/22/68

"Witness <u>R. D. Murray</u>, Chief of Police, Poplar, Mont.

"Time <u>8:35 A.M.</u>"

told you anything about any rights, or the right to have a lawyer?

"A   I don't remember that.

"Q   Do you remember the incident when someone read this paper that is called plaintiff's Exhibit # 5?

"A   I do not know.

"Q   Do you know whether or not that is your writing down there where it says 'not going to sign'?

"A   No, I did not even sign no paper.

"Q   Do I understand it was your desire not to be questioned when you were not going to sign a paper?

"A   Well, they just told me to sign it, and that is all.  They never said nothing.  They told me to go out.

"Q   They told you to go out?

"A   Yes.

"Q   When was it they told you to go out?

"A   That was soon after they signed that.

"*   *   *

"Q   When you went back in the second time were you being examined by the man you just saw on the witness stand?  (Mr. Saunders)

"A   Yes.

"Q   And was that the last time he examined you?

"A   Yes, I think so.

"Q   And what happened when he got through questioning you?

"A   He told me to wait outside in the lobby."

The officers interviewed Alves and Emily separately.  Each of the interviews with Alves was conducted in a room in the Law and Order office with the door closed.  The only other persons present were the interrogating officer and another law enforcement officer, and possibly for a brief period two other officers.[7]

Both Thompson and Saunders testified that Thompson "briefed" Saunders before Saunders began his interviews.  There is no evidence, however, that Thompson told Saunders that Mrs. Bird had been advised of her right to remain silent and had said she didn't want to talk any more.[8]

In testifying regarding the oral statement given by Mrs. Bird after being advised of her rights, Mr. Saunders refreshed his recollection from a typed statement prepared from notes he made at the time of the interview.  No effort was made to obtain a signed statement and the statement prepared by Mr. Saunders was not shown to the defendant.

Following the hearing before the court on defendant's motion to suppress her statement, the Government did not offer evidence of the Thompson interview, so that the issue of voluntariness submitted to the jury was concerned solely with the Saunders' interview.

Defendant contends first that after Thompson received the information from Eder, told defendant that "it was indicated" that she "might be mixed up into this", advised her of her rights to counsel and to remain silent, and defendant

---

7. Thompson testified that his interview ended before Saunders arrived.  Saunders testified that defendant was being interviewed by Thompson and Murray when he arrived.  It seems probable the Thompson interview had ended and that he remained in the room for a short time after Saunders started his first interview of the defendant.

8. With respect to the advice he received from Thompson, Saunders testified:

"Q   And had you been advised when officer Thompson summarized the situ-

ation to you that the defendant was suspect at that time?

"A   I had no reason to believe that she was, no, sir.  Nothing was said.

"Q   So far as you know he may have formed that judgment in his mind at that time?

"A   I do not know what was in his mind, but he did not relay it on to me.  There was nothing he said to indicate this."

indicated that she did not want to "talk any more", the questioning was "in-custody interrogation" and defendant was a "suspect" within the Miranda rules. In that event, argues defendant, neither Thompson nor Saunders had any right to continue the interviews. As the Court said in Miranda, " * * * (I)f the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." 384 U.S. at 445, 86 S.Ct. at 1612.[9]

With respect to this contention the Government argues that the questioning was not "in-custody interrogation", that Thompson was not "required" to give any warning, that the defendant was not then legally a suspect, and that in any event Saunders had a right to continue his separate interview.

Miranda defines "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way."* (Emphasis added). In a footnote the court explained that this definition is what was meant in Escobedo[10] by referring to an investigation which had focused on an accused.

Later in the opinion the Court said: " * * * General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." In a footnote the Court continued:

"The distinction and its significance has been aptly described in the opinion of a Scottish court:

'In former times such questioning, if undertaken, would be conducted by police officers visiting the house or place of business of the suspect and there questioning him, probably in the presence of a relation or friend. However convenient the modern practice may be, it must normally create a situation very unfavourable to the suspect.' " 384 U.S. at 478 n. 46, 86 S.Ct. at 1630.

There is no precise definition of when an accused is "otherwise deprived of his freedom * * * in any significant way". Obviously it is not necessary that he be under arrest[11] or in custody for the offense with which he is charged.[12] On the other hand, the mere

---

9. The Court continued: "The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned".

10. Escobedo v. Illinois, 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. In this case it was held that the decisive stage is reached when the investigation is no longer a general inquiry into an unsolved crime but has begun "to focus on a particular suspect", and when the questioning process shifts from "investigatory to accusatory".

11. The defendant here was not placed under arrest until after the third interview, during which the incriminating statement was obtained. It is true, as the Government argues, that in Escobedo the de-

fendant was under arrest prior to being interrogated, and this is true of most of the cases in which this question has been considered. On the other hand, Miranda does not make arrest a condition of "in-custody interrogation".

12. In the subsequent case of Mathis v. United States decided May 6, 1968, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381, it was held that the petitioner who was in a state prison and was "questioned by an Internal Revenue Service investigator about certain tax returns in a routine tax investigation," was entitled to warnings of his right to be silent and his right to counsel (from Syllabus). It is clear that "in-custody interrogation" is not limited to a person under arrest or in custody for the offense charged, but also applies where a person is in jail or prison on a wholly unrelated offense.

fact that the interview takes place in a police station[13] is not in itself sufficient to constitute an in-custody interrogation.[14] These are facts, however, to be taken into consideration in determining whether the accused has become a suspect and the "accusatory stage" of the investigation has been reached.

A distinction between statements taken during the "investigative" and "accusatory" stages of the proceedings was recognized in Lopez v. United States, 9 Cir. 1968, 399 F.2d 865, 867. There, as here, two statements were taken. The statement admitted was during the investigative stage. The district court sustained an objection to the admission of another statement made by the defendant. As the court said, "He had then become a suspect, no attorney was representing him and the questioning was designed to elicit an admission from him that he was connected with the crime".[15]

While the information received by Thompson from Eder did not directly implicate defendant in the alleged homicide, it did cause the interrogating officer to regard defendant as a suspect and

advise her of her rights to counsel and to remain silent. When defendant advised Thompson that she "did not want to talk about it any more" the interview was properly terminated.

Saunders instituted his interview immediately thereafter. Although Thompson "briefed" Saunders, apparently he did not tell Saunders that defendant did not want to talk any more. The defendant contends that this is immaterial and that the interview by Saunders must be regarded as a continuation of the Thompson interview, relying upon Miranda v. Arizona, in discussing the related case of Westover v. United States. After Westover had been in custody for 14 hours and interviewed at length by local police, an interrogation was begun immediately by the F. B. I. The F. B. I. gave the required warnings and shortly thereafter obtained a confession. The Court said in part: "Despite the fact that the FBI agents gave warnings at the outset of their interview, from Westover's point of view the warnings came at the end of the interrogation process. In these circumstances an intelligent waiver of constitutional rights cannot be assumed".[16]

---

13. The Law and Order office is the Indian reservation counterpart of the "police station". It is the place where Indians are taken for questioning when they are suspected of crime. It is also used for interviewing witnesses of an alleged crime whether or not they are possible suspects.

14. This is true even though the investigating officer requests the person interviewed to come to the station house for questioning. See Hicks v. United States, 1967, 127 U.S.App.D.C. 209, 382 F.2d 158.

15. In a footnote the court quotes from the testimony of a policeman, interrogated by the court: "Q. Did you, when you asked him to go to the trailer and when you started to talk to him, did you believe he might have had something to do with his grandfather's death? A. Yes. Q. Were you questioning him to get some admission or some evidence from him if he was so connected? A. Well, see, we do this to all the cases we have, most of them, serious cases. It is our normal procedure

up there. THE COURT: The objection is sustained." There is no evidence that the defendant was under arrest or in actual custody during either interview. Apparently he was taken to a trailer for interrogation prior to making the statement which was not admitted in evidence.

16. The Court said further: "We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station—in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities

The Government's position here finds some support in Jennings v. United States, 5 Cir. 1968, 391 F.2d 512.[17] The defendant, a 25 year old man previously convicted of attempted murder, was charged with interstate transportation of a stolen motor vehicle. After being placed under arrest by local police, he was advised fully of his constitutional rights. After he had "answered a few questions too rapidly for the officers to write down the answers, he announced he would not answer further and the interrogation immediately stopped". Within an hour an F. B. I. agent arrived. He was not told by either the police or the accused that the accused had announced his unwillingness to answer any further questions. The F. B. I. agent again gave the Miranda warnings, and the "[accused] signed a waiver and did not hesitate to discuss the matter with the agent". His statement was reduced to writing and signed.[18]

The court held that the statement was properly admitted, distinguishing the facts from Miranda—Westover by stating that "what the Court sought to interdict in Miranda were those situations in which a person has indicated his desire to exercise his constitutional right of silence but the police refused to take 'no' for an answer". It is of course clear in this case that Thompson terminated the interview when the defendant said she did not want to talk any more. However, there was no lapse of time between the two interviews. In fact Saunders testified that the other officers were interviewing the defendant when he arrived, although, as noted supra, it seems more probable that Thompson's interview had

terminated and Saunders started immediately thereafter.

Plaintiff relies heavily on Hicks v. United States, 1967, 127 U.S.App.D.C. 209, 382 F.2d 158. There are many similarities between the two cases, but there are also factual differences which clearly distinguish Hicks from this case. In Hicks the investigation was undertaken after the defendant "voluntarily reported a homicide; Appellant, not police, set the inquiry in motion. * * * (H)er conduct and very presence at the police station were part of her attempt to put the police on a wild goose chase in search of the mythical 'jitterbug' attackers".

In Hicks the defendant gave "exculpatory answers which satisfied the police". After a written statement was prepared "[and the defendant] demurred about signing" the officer "explicitly assured her that he considered her only a witness". She had been promised in advance by the police that "she would be taken home by car, and her incriminating statements were made as the police were about to fulfill that promise". Elsewhere in the opinion the court refers to "her spontaneous oral admission". 382 F.2d at 162.

Without reviewing further the cases cited by the respective parties, it may be said that all suggest the advisability of the "cautious case-by-case approach", which Judge Simpson deemed necessary (supra note 17) and also the importance of considering the "totality of the circumstances" rather than emphasizing unduly any isolated factor.

Assuming (1) that Thompson was not "required" to advise defendant of her right to counsel and to remain silent,

---

were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege." 384 U.S. at 496–497, 86 S.Ct. at 1639.

17. In a concurring opinion Judge Simpson commented: "This is a fluid and fast-developing field of federal constitutional law. In this situation, a cautious case-

by-case approach is necessary to proper development of controlling precedent." 391 F.2d at 516.

18. It will be noted that Jennings was a more sophisticated accused and that he signed both the waiver and statement without question. In the instant case there was no evidence at the suppression hearing with respect to defendant's "prior contact with authorities", if any.

even though he did so, and (2) that under the circumstances the statement was not barred solely by reason of defendant's indication to Thompson that she did not want to talk any more, I agree with counsel for the defendant that this incident must be considered with other circumstances in determining whether the defendant has made a voluntary, knowing and intelligent waiver.

It is of course conceded that at the time of Saunders' second interview the investigation had focused on the defendant. At that time she was already in the "station house". There can be no question that the Government then had a "heavy burden" to "demonstrate that the defendant knowingly and intelligently waived (her) privilege against self-incrimination and (her) right to retained or appointed counsel." 384 U.S. at 475,[19] 86 S.Ct. at 1628.

It appears from the waiver form (supra note 6) that Saunders began to advise defendant of her rights at 8:33 A.M. and that this terminated two minutes later at 8:35. Saunders testified that at the outset he again informed the defendant of his identity, showed his credentials, informed her that she was a suspect and that he "was going to question her concerning an alleged stabbing of the deceased by her" and informed her of her rights as set forth in the form. He had the defendant read aloud the statement and waiver and asked her if she understood it, to which she replied in the affirmative. He then asked her whether she would sign the waiver, to which she replied, "I am not going to sign",[20] whereupon he "asked her if she wanted to talk to us anyway knowing—without having a lawyer present, and she agreed".[21] The statement and waiver may be read aloud in approximately one minute by a rapid reader. For a slow reader it takes from one and one-fourth to one and one-half minutes, and it seems probably from the observation of defendant in court that she would come under the "slow reader" category. This left little time to explain the rights, if any further explanation was required in view of defendant's prior statement that she did not want to talk and her refusal to sign the waiver.

Ordinarily it is not essential that the agent advise an accused of his rights orally. Where the accused reads and understands the written advice, that is sufficient.[22] The critical question is whether the defendant here fully understood the warning and voluntarily, knowingly, and intelligently waived her rights. In this connection the Government must show, inter alia, that the defendant "was

19. The Court said further: "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in Carnley v. Cochran, 369 U.S. 506, 516 [82 S.Ct. 884, 890, 8 L.Ed.2d 70] (1962), is applicable here:

'Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, *that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.*' " (Emphasis added.)

20. The mere fact that the defendant was unwilling to sign the waiver would not in itself render the statement inadmissible. See Keegan v. United States, 9 Cir. 1967, 385 F.2d 260, 263, where the accused read the waiver document "and said he did not wish to sign, but would be willing to talk (to the F.B.I. Agent) without an attorney being present".

21. It is questionable whether this is sufficient to comply with the Miranda requirement that the defendant make "an express statement" that she was "willing to make a statement" and did "not want an attorney".

22. See Bell v. United States, 9 Cir. 1967, 382 F.2d 985, 987.

offered counsel but intelligently and un-derstandingly rejected the offer". (See note 19, supra).

Pertinent factors to be considered in determining whether defendant made a voluntary, knowing and intelligent waiv-er may be summarized as follows:

(1) The defendant is an Indian with an eighth grade education; (2) during the night before the interviews she had been drinking between 8:00 P.M. and approximately 1:00 A.M., was described as "drunk" around 1:00 A.M., and ap-parently had no sleep prior to the first interview which began at 7:00 A.M.; (3) she was taken 13 miles from her home to the Law and Order Office by two officers (one a law enforcement officer of the Bureau of Indian Affairs and the other a chief of police and deputy sheriff) to be interviewed "as a witness"; (4) three interviews were conducted in a closed room in which defendant was alone with two (and possibly for a short time, three) interrogating officers; (5) during the first interview one of the officers ob-tained information which caused him to consider the defendant a "suspect" of the alleged homicide, whereupon he told defendant that it was "indicated" she "might be mixed up" in the alleged of-fense, advised her of her rights to counsel and to remain silent, she informed the officer that she did not want to "talk any more", and this interview terminated; (6) immediately thereafter an F. B. I. agent (without knowing of defendant's statement that she did not want to talk any more) began his interview of the defendant "as a witness"; (7) later after obtaining information from de-fendant's daughter which implicated de-fendant in the homicide, and prior to the third interview, the agent advised de-fendant of her rights and had her read aloud to him the statement of rights and waiver form, after which the defendant said, "I don't want to sign", whereupon the agent asked her if she wanted to talk anyway without an attorney and she agreed, this warning and oral waiver taking two minutes; (8) there is no evidence that defendant was otherwise "offered counsel" and "intelligently and understandingly rejected the offer", or of any further explanation of her rights after she declined to sign the waiver; (9) the oral admission was obtained about 9:15 A.M., during the third inter-view and approximately two hours after defendant had told the first officer that she did not want to talk any more; and (10) the defendant testified that she "thought maybe I had to" let them ques-tion her.

■ Based upon the "totality of cir-cumstances" and my observation of the defendant at the trial, her background, her intelligence, her testimony as re-counted in part in this opinion, I am un-able to find that the Government has sustained its "heavy burden" of "demon-strating" a "voluntary and intelligent waiver".[23]

Accordingly I must conclude (1) that the oral statement of the defendant to Agent Saunders was improperly ad-mitted; (2) that without this statement there was insufficient evidence to submit the case to the jury; and (3) that the motion for judgment of acquittal must therefore be granted.

It is ordered that the defendant's mo-tion for judgment of acquittal is granted.

---

23. The obligations of the trial court in passing upon the admissibility of a con-fession were well summarized in Evans v. United States, 8 Cir. 1967, 375 F.2d 355, 360:

"In summary, the district court was required to make a finding on the rec-ord with 'unmistakable clarity' that (1) the Miranda warnings were given; (2) the defendant knowingly and intelligent-ly waived his privilege against self-in-crimination * * * (3) the defend-ant voluntarily, knowingly and intelli-gently waived his right to have retained or appointed counsel present at the in-terrogation; (4) the confession or statement was freely and voluntarily made."