THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v TOMMY LEE NEWSON, Respondent.

Second Department, June 4, 1979

### APPEARANCES OF COUNSEL

*John J. Santucci, District Attorney (Joan L. Craig* of counsel), for appellant.

*James Horan* for respondent.

### OPINION OF THE COURT

SHAPIRO, J.

The defendant was indicted for murder in the second degree and criminal possession of a weapon in the fourth degree (an electrical cord) in connection with the death by strangulation of one Mildred Cheeks. Thereafter the Supreme Court, Queens County (BROWNE, J.), granted defendant's motion to suppress certain statements made by him to the police and the District Attorney. The People appeal. There should be an affirmance.

### ISSUES

1. Was the defendant in custody at the time of his first statement, thereby requiring suppression of that statement because of the failure of the interrogating detective to adequately inform defendant of his *Miranda* rights?

2. Was the defendant's second statement inadmissible even though preceded by proper *Miranda* warnings, upon the grounds (a) that it was made upon constraint of the first statement, or (b) that the two statements were part of a single continuous chain of events?

At the *Huntley* hearing (see *People v Huntley,* 15 NY2d 72), the court heard the testimony of two witnesses—Detective Flemings and Assistant District Attorney McCloskey, each of whom had questioned defendant and obtained a statement from him.

Flemings testified that he reported for duty at about 1:00 A.M. on June 28, 1977 and was then informed of a homicide in the 100th Precinct. At about 1:30 A.M. he arrived at 169 Beach 115th Street, where he observed the victim (Mildred Cheeks) lying on a bed with an electric cord wrapped around her neck. He then went to the 100th Precinct detective office. Sometime between 1:30 and 2:15 A.M. he spoke to defendant.

Defendant had called the police to the scene of the homicide and the questioning concerned why he had made the call. Sometime during the course of this questioning, Flemings advised defendant of his rights:

"Q And what rights did you advise him of?

"A I advised him of his rights to counsel. I advised him that anything he said may be used against him in a court of law. I advised him that he was entitled to an attorney. And—

"THE COURT: What else?

"THE WITNESS: I advised him he was entitled to an attorney. I advised him that he didn't have to make a statement.

"THE COURT: What else did you advise him of?

"THE WITNESS: I advised him that anything he said could be used against him in a court of law.

"THE COURT: What else did you tell him, if anything?

"THE WITNESS: That's about all.

"THE COURT: Well, let me ask you this. When you were advising him, did you do it from memory or did you have something with you?

"THE WITNESS: I did it from memory."

Flemings then testified:

"A Well, after telling us several stories, he told us that him

and Mildred had been drinking earlier that evening. And that they had gotten into an argument relative to his fooling around with other girls on the block. He told her that he hasn't been fooling around with girls on the block, and that she should leave him alone. She used the expression—called him a 'pussy' and he said he got very upset, and she put him out of her room. Later on he went down to her room, which is on the first floor. The door was locked. He said he believed he kicked it in. He went in the room. They started arguing again. And they made up. They were laying on the bed rassling *[sic]*. He remembered that she had called him a bad name, and he reached and grabbed an electric cord that was on the bed, wrapped it around her neck and pulled it.

"She lost consciousness. He tried to revive her, and then called the police. And that was the statement."

Flemings described defendant's status at that time as "a witness who had discovered a woman dead, who had dialed 911, who we needed to possibly speak to to get some insight as to what happened to this deceased."

On cross-examination, Flemings testified that defendant had called 911 at about 10:00 or 10:30 P.M. He did not know when the police first arrived at the scene, but they were there when he arrived at 1:30 A.M. At that time, defendant was already at the 100th Precinct.

When Flemings arrived at the precinct, defendant was sitting with two detectives. He was not handcuffed. Initially, Flemings stated that he did not know whether defendant was free to go at that time. Immediately thereafter, however, he stated that defendant was not under arrest at that time and could have gotten up and walked out. Flemings then conferred with the two detectives, asking them to bring him up to date on the investigation. More specifically, he asked them: (1) what defendant had to do with the investigation; (2) why defendant was at the precinct; (3) whether they had questioned defendant; (4) whether defendant had made a statement; (5) whether defendant was a suspect; and (6) whether there were other suspects. He did not ask them: (1) what time they had arrived at the scene; (2) what time they had brought defendant to the precinct; (3) what questions they had asked defendant; and (4) whether they had given defendant *Miranda* warnings.

The detectives told him that defendant "was telling several different stories about what had happened." One story was

that the victim had tried to kill herself several times in the past and that she had wrapped a cord around her neck and killed herself. Another was that someone had come into the victim's room through the window, wrapped the cord around her neck and left through the window. Flemings concluded, however, that these "stories" were merely defendant's speculation as to what might have happened, and that they were not events which defendant said he had witnessed.

As the result of the information he received from the detectives, Flemings further questioned defendant as to why he had called the police. He had no knowledge of any confession defendant might have made and was of the opinion that defendant had, up to that time, made no admissions.

There came a time during the course of the questioning when, in Flemings' mind, defendant became a suspect. Flemings explained his thoughts at the time as follows: "It was my opinion from speaking to Mr. Newson, and it was also my opinion from other aspects of the investigation that this man had in the past had violent altercations regarding [the victim] —where the police had to come with this particular person, and being that he was telling different stories of his opinion of what happened, I felt it was something more here than had transpired."

At that point Flemings advised defendant of his *Miranda* rights in the manner noted above. During the ensuing 20 minutes, Flemings obtained a statement which the hearing court suppressed. At the conclusion of the statement, Flemings formally placed the defendant under arrest. It was then 2:20 or 2:30 A.M. At 3:00 A.M. Flemings called McCloskey and informed him of the confession. Immediately thereafter, Flemings and defendant left for the 113th Precinct. The trip took 45 minutes at the most and they arrived at about 3:45 A.M. McCloskey, who was already there, set up a tape recorder, spoke to Flemings about the case and then said he was ready to talk to defendant.

Flemings was in the room when McCloskey questioned defendant and also participated in the questioning. During that time, defendant was nervous and stammered. He was also a little upset. McCloskey read defendant his rights from a card and asked him if he wanted to make a statement. Defendant replied that he did.

McCloskey testified that at 4:00 A.M. on June 28, 1977, he went to the 113th Precinct and spoke to Detective Flemings.

He then spoke to defendant with Flemings present. This conversation was recorded. He identified the tape of the conversation which was then played for the court. The substance of his statement is not pertinent to this appeal.

### THE HEARING COURT'S DECISION

After summarizing the substance of the *Miranda* decision, the court set forth the following conclusions of law:

"8. In the instant matter, the testimony of the detective is that he advised the defendant of three of his rights from memory at a point in their discussions when he became suspicious from the defendant's statements. The officer's *Miranda* warnings were incomplete and inadequate. The failure of the detective to advise the defendant of all of his rights precluded him from knowingly and intelligently waiving them. The law requires the People to prove a voluntary waiver. The facts herein do not satisfy the burden of proof that the People bear.

"9. The inadequacy of the warnings combined with the police dominated atmosphere of the questioning makes the voluntariness of the defendant's waiver of rights suspect. Under the circumstances surrounding this confession, it is apparent the defendant could have reasonably inferred that he was in custody from the time he was first brought and questioned in police headquarters. Under the test in *People v. Yukl,* 25 NY 2d 585 (1969), the circumstances of the defendant's repeated questioning clearly indicates a situation where 'a man who makes admissions under duress or in violation of his constitutional right to warning and advice may feel so committed by what he has then said that he believes it futile to assert his rights after he has later been advised of them before new questioning begins.' See *People v. Tanner,* 30 NY 2d 102 (1972). The defendant was nervous, crying and stammering. Also the defendant repeatedly protested his innocence. In turn, statements to the detective are not subsequently repeated when questioned after warnings by the Assistanct District Attorney. Under these circumstances, this Court finds the defendant was not adequately warned of his *Miranda* warnings and did not knowingly, intelligently, and voluntarily waive them.

"10. The questioning by the Assistant District Attorney, although preceded by *Miranda* warnings, was conducted in the same police dominated atmosphere and was directly generated

from the preceding questioning by the detective. Under these circumstances, the taped confession was tainted by the earlier questioning and is accordingly precluded under the principles of the *Miranda* cases."

The court thereupon ordered the suppression of defendant's two statements.

## THE LAW

### THE ADEQUACY OF THE MIRANDA WARNINGS

The People candidly concede Detective Flemings' "failure to adequately advise [defendant] of his *Miranda* warnings" prior to the questioning which led to defendant's first statement. While the warnings given defendant contained the statement that he had the right to an attorney, Flemings failed to advise him that if he could not afford an attorney, one would be appointed.[1]

Additionally, Flemings did not advise defendant that his right to counsel attached immediately, prior to questioning by the police, and not at some time in the future. Whether a failure of this nature renders the *Miranda* warnings inadequate is an issue which has not yet finally been settled[2] and which we do not find it necessary to now decide.

---

1. In *Miranda v Arizona* (384 US 436, 473), the Supreme Court of the United States stated: *"In order fully to apprise a person interrogated of the extent of his rights under this system then, it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him.* Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent— the person most often subjected to interrogation—the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it." (Emphasis supplied.) There is no contention by the People that the defendant had the financial ability to engage his own lawyer so that a "harmless error" analysis is not warranted.

2. In *People v Tutt* (47 AD2d 911, affd 38 NY2d 1011), defendant had been advised of his right to an attorney, but had not explicitly been informed that he was entitled to an attorney during questioning by the police. This court affirmed defendant's conviction without opinion. In the Court of Appeals, however, the four-Judge majority (BREITEL, Ch. J., JASEN, GABRIELLI and JONES, JJ.), in their memorandum for affirmance, did not reach the issue of the *Miranda* warnings. They held that defendant had failed to preserve the alleged error for review. Judge GABRIELLI, joined by Judge JASEN, additionally chose to address the merits of defendant's argument saying (p 1013):

*"Miranda v Arizona* (384 US 436) does not require any ritualistic incantation to

The People argue, however, that the inadequacy of the *Miranda* warnings given by Detective Flemings is irrelevant because defendant was not in custody at the time he was questioned and, therefore, no *Miranda* warnings were re-

effectuate its salutary purpose of alerting a suspect to his constitutional rights to remain silent and to have the assistance of an attorney (see *United States v Vanterpool*, 394 F2d 697, 698-699). Here the defendant was given the following admonitions by the arresting officer:

" 'You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford an attorney, one will be provided for you by the state.'

"In light of this statement, which fairly apprised the defendant of his right to an attorney prior to making any statement to the police, defendant's belated claim that the warnings were improper because he was not specifically informed of his right to have an attorney present during questioning, is without merit. Defendant was told without qualification that he had a right to an attorney. In the context of the previous advisement that he did not have to make any statement to the police, the defendant was effectively informed that he had the right to consult an attorney before making any statement to the police."

Judge (now Chief Judge) COOKE, joined by Judges WACHTLER and FUCHSBERG, did not agree, saying (pp 1015-1017):

"The failure of the arresting officer to adequately inform defendant of his right to the assistance of counsel prior to and during custodial interrogation violated the principles articulated in *Miranda v Arizona* (384 US 436). Absent a knowing and voluntary waiver of this right, incriminating statements made by defendant after his arrest should have been suppressed. * * *

"The People, although contending that there was substantial compliance with *Miranda,* concede that Patrolman Zuefle's admonitions were 'incomplete' and that '[t]here was no evidence that appellant was told that he had the right to consult with a lawyer prior to any questioning and to have an attorney present during the interrogation.' These acknowledgments demonstrate that the warnings specifically required by *Miranda* were not fully given, since defendant was not warned prior to questioning that he had the right to consult with an attorney prior to the interrogation and to have the attorney present during the interrogation. * * *

"This court adopted the *Miranda* warnings in *People v Rodney P. (Anonymous)* (21 NY2d 1), where it was stated at pages 3-4:

" 'The Supreme Court held in *Miranda* that a person who is taken into custody or deprived of his freedom in any significant way must be advised that he is not obligated to answer any questions; that, if he does speak, anything he says may be used against him in court; that *he is entitled to the assistance of counsel prior to and during the questioning,* and that, if he desires counsel and is unable to retain one, counsel will be assigned to him.

" *'That such warnings must be given* after a person is formally arrested and physically detained *is clear'* (emphasis supplied).

"Although there is disagreement in certain Federal appellate decisions, some in strong support of the position taken in this dissent (see, e.g., *Sanchez v Beto,* 467 F2d 513, cert den *sub nom. Estelle v Sanchez,* 411 US 921; *Atwell v United States,* 398 F2d 507; *Lathers v United States,* 396 F2d 524; *Montoya v United States,* 392 F2d 731), *Miranda* has not been overruled by any subsequent decision of the Supreme Court nor has the Court of Appeals deviated from its holding in *Rodney P.* "

quired. In making that contention the People disregard the factual finding of the hearing court to the contrary.

The appropriate test to determine whether a person being questioned is in custody was stated in *People v Yukl* (25 NY2d 585, 589, cert den 400 US 851) as follows: "In deciding whether a defendant was in custody prior to receiving his warnings, the subjective beliefs of the defendant are not to be the determinative factor. The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position. *(Hicks v. United States,* 382 F.2d 158; see, also, *People v. Rodney P. [Anonymous],* 21 N Y 2d 1; *Williams v. United States,* 381 F.2d 20; *Fuller v. United States,* 407 F.2d 1199; *State v. Seefeldt,* 51 N.J. 472; *Conyers v. United States,* 237 A.2d 838 [D.C. Ct. of App.]; *State v. Bower,* 77 Wn. 2d 634.)* Moreover, the fact that a defendant is being interviewed in the police station does not necessarily mean that he is to be considered 'in custody'. *(United States v. Bird,* 293 F.Supp. 1265; *Freije v. United States,* 408 F.2d 100; *Hicks v. United States, supra.)* This is merely one of the factors to be considered in reaching the ultimate conclusion."

In *Yukl,* defendant notified the police that he had found the dead body of a woman in a vacant apartment in the building in which he resided. The police arrived at the scene and defendant explained how he came to discover the body. Some 3 hours and 45 minutes after the original call, the police suggested that defendant and his wife accompany them to the station house " 'because there were less disturbances.' " *(People v Yukl, supra,* p 587.) At the precinct, defendant was interviewed for some three and one-half to four hours. During this time, he did not implicate himself in the murder. Shortly after the interview had concluded, however, the police noticed stains on defendant's trousers. They requested that he remove them and defendant complied. The police then noticed brown stains on defendant's jockey shorts, which he also removed at the request of the police.

At that point, defendant was given his rights, waived them, and thereafter confessed to the murder.

The trial court found that defendant was not in custody prior to receiving the *Miranda* warnings. The Appellate Division, First Department, affirmed the judgment and the Court of Appeals affirmed the order of the Appellate Division, stating *(People v Yukl, supra,* pp 591-592):

"The testimony on the record supports the conclusion that Yukl voluntarily came down to the police station, voluntarily answered the questions and voluntarily gave up the various articles of clothing. It may not be said, as a matter of law, that prior to receiving the warnings, a man in Yukl's position would have felt that he was in custody. Although it may be possible that Yukl felt obliged to co-operate with the police in order to maintain his facade of innocence, this subjective view by the defendant does not require that we find him to have been in custody.

"The hearing court, considering all of the circumstances including defendant's background and the demeanor of the witnesses before it, concluded that defendant was not in custody prior to receiving the warnings and that after receiving the warnings he participated voluntarily in the questioning. There is clearly sufficient evidence in the record to support this conclusion."

The People assert that the. operative facts in *Yukl* are "nearly identical" with those in this case. It is true that here, as in *Yukl,* the defendant called the police after assertedly discovering a body. Further, Criminal Term found, as had the court in *Yukl,* that defendant was brought to the station house for questioning as a witness, not as a suspect. However, the one difference between *Yukl* and our case is more critical than those similarities. In *Yukl,* the trial court found *as a fact* that defendant was not in custody at the time he gave up the articles of clothing. Here, by contrast, Criminal Term found *as a fact* that defendant was in custody at the time he made his first statement.

In such a context, the court in *Yukl* stated pertinently (p 588):

"The crux of the issue before us is whether the hearing court's findings, affirmed by the Appellate Division, that the defendant was not in custody prior to receiving the *Miranda* warnings and that, after receiving the warnings, he understood and voluntarily waived his rights, are erroneous as a matter of law.

"We note at the outset that in reviewing the hearing court's finding that there was no custodial interrogation prior to the warnings being administered, and that admissions given were voluntary, great deference must be allowed the trier of fact. As we said in *People v. Leonti* (18 N Y 2d 384, 390). '[W]here there are conflicting inferences to be drawn from the proof,

the choice of inferences is for the trier of the facts. And that choice is to be honored unless unsupported, as a matter of law'."

■ Accordingly, unless the finding of Criminal Term that defendant was in custody at the time he gave his first statement, is erroneous as a matter of law or is against the weight of the evidence, the suppression order must be affirmed. That is the significant difference between *Yukl* and this case.

Criminal Term's statement that *"defendant could have reasonably inferred that he was in custody from the time he was first brought and questioned in police headquarters"* (emphasis supplied) might suggest that the court improperly considered the question of custody from the point of view of the defendant, rather than from the point of view of an innocent man in defendant's position, but I do not believe that to be the case. The defendant did not testify at the *Huntley* hearing. Thus, the court could not have known what defendant thought of his situation. Under such circumstances, I believe the court employed an objective rather than a subjective standard in deciding the question of custody. Accordingly, I am inclined to the view that Criminal Term's statement merely reflects a poor choice of words and does not indicate that, as a matter of law, it did not properly apply the test of "what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position" (see *People v Yukl, supra,* p 589), particularly since he cited the *Yukl* case as the ground for his conclusion.

Turning to the facts underlying defendant's custodial status, it should be remembered that while Criminal Term found that defendant had originally been brought to the precinct as a witness, the record is otherwise virtually silent as to what occurred during the approximately four-hour period between the time defendant called 911 and the time Flemings arrived at the precinct. It does appear that prior to being questioned by Flemings, defendant was questioned by at least two other detectives, in an unknown manner, under unknown circumstances, and for an unknown length of time, resulting in the conclusion that defendant was telling different stories as to what had or might have happened to Mildred Cheeks. It thus becomes apparent that the most important element underlying Criminal Term's factual finding was Flemings' testimony that during his questioning of defendant, and before defendant made the statement here in issue, he himself came to view defendant as being in his custody, and acted on this view by

advising defendant of his rights, albeit inadequately. Criminal Term was entitled to give this testimony great weight in coming to the conclusion that defendant was in custody when he made the statement which was suppressed.

Coupled with the fact that there were no clear indicia that defendant was not in custody at the time he gave his statement and with the inferences which Criminal Term could permissibly have drawn from observing Flemings as he testified, the factual finding " 'is to be honored unless unsupported, as a matter of law' " *(People v Yukl, supra,* p 588). It cannot be said that in finding that defendant was in custody Criminal Term erred as a matter of law or that that finding was contrary to the weight of the evidence.

### THE SECOND STATEMENT

■ Criminal Term granted suppression of defendant's second statement upon the ground that it was tainted by the improperly obtained first statement. The People argue that even if the court properly granted suppression of defendant's statement to Flemings, his subsequent statement to McCloskey should not be suppressed, because there is no basis upon which to conclude that it was the illegal fruit of the first. This argument is based upon the testimony that the two statements were obtained at two separate locations, one and one-half hours apart, and that the interrogations leading to these statements were substantially conducted by two different parties. Although I disagree with Criminal Term's reasoning as to the second statement, I believe it reached the proper result.

The hearing court relied on *People v Tanner* (30 NY2d 102, 105-106), where the court stated: "A man who makes admissions under duress or in violation of his constitutional right to warning and advice may feel so committed by what he has then said that he believes it futile to assert his rights after he has been later advised of them before new questioning begins. This state of mind may have an effect on the waiver leading to the later admissions; or on the voluntary nature of those admissions."

However, the court in *Tanner* then went on to state *(supra,* p 106): "Whether an accused believes himself so committed by a prior statement that he feels bound to make another, depends on his state of mind which is a fact question."

Noting, *inter alia,* that Tanner, in testifying at his suppression hearing, did not contend that his first statement had any effect on his later statement, the court found no factual basis for concluding that the later statement was tainted by the earlier one. Here the defendant did not testify so that the holding in *Tanner* is inapplicable.

In *People v Chapple* (38 NY2d 112, 114-115), the Court of Appeals sanctioned an additional theory upon which a defendant's statement could be suppressed, even though preceded by proper *Miranda* warnings:

"The majority below affirmed Chapple's conviction, upon his plea of guilty to one count of burglary, on the authority of *People v Tanner* (30 NY2d 102). In that case we affirmed the conviction of a defendant whose testimony, directed toward the 'cat out of the bag' theory (see *United States v Bayer,* 331 US 532), the lower courts found wholly incredible. The credibility of that defendant was for the lower courts to assess; we did not review their conclusions. Moreover, we refused to adopt any rule which would have the effect of automatically invalidating a confession. (See, also, *People v Stephen J. B.,* 23 NY2d 611, 615; *People v Jennings,* 33 NY2d 880, affg 40 AD2d 357, 363.)

"The case before us, however, unlike *Tanner,* is not premised on the theory that the defendant may have made his second confession on constraint of his first one. Chapple's defense, as noted by the dissenters in the Appellate Division, is premised instead on the theory that the sequence of events, beginning with his impulsive and apparently illegal arrest and ending with the four signed confessions, was, in reality, a single continuous chain of events. Because it focused on the *Tanner* approach, the majority made no findings of fact with respect to the continuous chain of events in this case. We hold that, as a matter of law, such a theory may support a claim that a confession such as this one is inadmissible because not truly voluntary. * * *

"Warnings, to be effective under the combined holdings in *Miranda* and *Westover [Westover v United States,* 384 US 436], must *precede* the subjection of a defendant to questioning. Later is too late, unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning. (George, The Fruits of Miranda: Scope of the Exclusionary Rule, 39 U Col L Rev 478,

492-493; see *United States ex rel. B. v Shelly,* 430 F2d 215, 218; *Harney v United States,* 407 F2d 586; *Evans v United States,* 375 F2d 355; cf. *Darwin v Connecticut,* 391 US 346; *Clewis v Texas,* 386 US 707, 710; *Matter of Michael G.,* 40 AD2d 520; *United States v Knight,* 395 F2d 971, cert den 395 US 930.)

"Unlike theories which require examination of a defendant's testimony as to his state of mind and, thus, an assessment of his credibility, the *Westover* approach may be based on an assessment of external events."

*Chapple* was a case in which the defendant was questioned without *Miranda* warnings, then given *Miranda* warnings and questioned further, thereafter signing four confessions. The court concluded that defendant had been subjected to such a continuous interrogation as to render the *Miranda* warnings administered in the midst thereof insufficient.

In *People v Glover* (58 AD2d 814), this court had occasion to distinguish *Chapple* in a situation where defendant made two statements, the first not preceded by adequate *Miranda* warnings, the second preceded by proper warnings. We there said (pp 814-815): "Shortly before the noon hour on August 27, 1975, the defendant-respondent was taken to the 90th Precinct in Brooklyn, where he was interrogated by Detective Brocato concerning his possible involvement in an armed robbery which had occurred on August 20, 1975. The defendant remained in the 90th Precinct for about an hour and a half, during which time he was neither handcuffed nor threatened. At no time did he express a desire to leave. The defendant was not, however, apprised of his rights, in clear violation of the dictates of *Miranda v Arizona* (384 US 436). The People concede that this renders the inculpatory statements made to Detective Brocato inadmissible. Following his interrogation at the 90th Precinct, Detective Martin transported the defendant to the 67th Precinct, where the latter attempted, without success, to identify an accomplice from mugshots. Later, at or about 2:00 P.M., he was transported to the 77th Precinct, where Detective Martin placed the defendant in an office and called Assistant District Attorney Marshak. The latter arrived at or about 5:00 P.M. and informed the defendant of his constitutional rights. Glover thereupon waived those rights, agreed to answer his questions, and gave the assistant an incriminating statement. During the period between 2:00 P.M. and 5:00 P.M., the defendant was not interrogated or physi-

cally restrained in any way. He was not, however, free to leave. On these facts, adduced without contradiction at the *Huntley* hearing, Criminal Term suppressed the statement on the ground, *inter alia,* that the defendant had been subjected to continuous custodial interrogation beginning at the 90th Precinct; that, since the defendant had not been apprised of his rights at the outset, the subsequent *Miranda* warnings were insufficient to overcome the effect of the continuous interrogation; and that, under the authority of *Westover v United States* (384 US 436) and *People v Chapple* (38 NY2d 112), the defendant's purported waiver was not knowingly and intelligently made. The People appeal pursuant to CPL 450.50 (subd 1). In our opinion, the facts in *Westover* and *Chapple* are clearly distinguishable from those at bar. Indeed, the Justice presiding at Criminal Term appears to have misapprehended the significance of the statement in *Chapple* that 'Warnings, to be effective under the combined holdings in *Miranda* and *Westover,* must *precede* the subjection of a defendant to questioning. Later is too late, *unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning' (People v Chapple, supra,* p 115 [emphasis supplied]). In a similar vein, the Supreme Court of the United States held in *Westover* that where continuous questioning occurs *between* two statements, and where the second statement (given with the benefit of *Miranda* warnings) occurs without the defendant's being removed both in time and place from the surroundings of the first (obtained *without* the benefit of those warnings), the second statement may not be admitted *(Westover v United States, supra,* pp 494-497). In the case at bar, the two interrogations were conducted during the same day. More importantly, however, they were conducted at different locations, by different interrogators, and were separated by a time span of approximately three hours. During that hiatus the defendant was left completely alone in an unlocked office, and was therefore placed in a position where he could reflect fully and freely both on his situation and how he wished to proceed. He was not spoken to, threatened or handcuffed. Morever, he never complained or expressed any desire to leave. Under these circumstances, the facts at bar more closely resemble those in *People v Tanner* (36 AD2d 690, affd 30 NY2d 102), wherein we upheld the admissibility of a confession given to an Assistant District Attorney with the

benefit of *Miranda* warnings, but less than two hours after an invalid confession had been elicited from the defendant without such warnings. In affirming, Judge Bergan, writing for an unanimous Court of Appeals, noted (p 106): 'Whether an accused believes himself so committed by a prior statement that he feels bound to make another, depends on his state of mind which is a fact[ual] question.' The defendant at bar did not testify at the *Huntley* hearing. There is, therefore, no basis in fact for concluding that the subsequent statement was the illegal fruit of the first (see *United States v Bayer,* 331 US 532, 540-541; *Lyons v Oklahoma,* 322 US 596; cf. *Harney v United States,* 407 F2d 586; *Evans v United States,* 375 F2d 355)."

In my view, *Glover* is not controlling here by reason of the entirely dissimilar factual picture. Here the first statement was taken from defendant at about 2:20 or 2:30 A.M. There is no testimony as to what happened during the next 30 minutes. At 3:00 A.M., Flemings called McCloskey. Defendant was immediately transported to the 113th Precinct, arriving at about 3:45 A.M. There followed another hiatus of about 30-35 minutes. McCloskey began to question defendant at 4:23 A.M. Thus, there was at most a two-hour breach between the first and second interrogations. Almost half of this period was consumed in transporting defendant from one precinct to another, a time during which he was always in the custody of the police. There is no indication as to what occurred during the remaining interval and thus, contrary to *Glover,* no indication of a period for reflection. Furthermore, in our case, although McCloskey conducted the bulk of the second interrogation, *Flemings was present in the room during most if not all of this time and participated in the questioning.*

Under such circumstances, and remembering that the burden is on the People to show that the hearing court erred as a matter of law or fact, in suppressing the second statement, we cannot say that there was "such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning" (see *People v Chapple,* 38 NY2d 112, 115, *supra).*

Accordingly, defendant's second statement was also properly suppressed. The order appealed from should therefore be affirmed.

SUOZZI, J. P., RABIN and GULOTTA, JJ., concur.

Order of the Supreme Court, Queens County, dated October 4, 1978, affirmed.