OPINION OF THE COURT
Daniel F. McMahon, J.
The defendants are charged in a four-count indictment with the crimes of robbery in the first degree, an armed felony; criminal use of a firearm in the first degree, an armed felony; robbery in the second degree and criminal possession of a weapon in the fourth degree, arising out of an alleged forcible stealing of property from one Francis Baez, on August 12, 1980, during which incident a pistol was allegedly displayed. A Huntley hearing was held on January 29 and February 2,1980. The People called three witnesses: Police Officer William Shannon, assigned to the Bronx Public Morals Division, Police Officer Daniel Kiely, recently assigned to the Bomb Squad and Police Officer Gerald Durden, assigned to the 46th Precinct. The defendants called no witnesses. The following credible evidence was adduced at the hearing:
Police Officer Gerald Durden, assigned to the 46th Precinct, was on routine radio motor patrol with his partner, Police Officer Cedo, on August 12, 1980. At approximately 10:40 p.m. Officer Durden testified that he was at 177th *616 Street and Davidson Avenue when an individual identified as Francis Baez flagged down the police vehicle. He stated to the officers that he had been robbed at gunpoint by two black males and that they had stolen his car. He gave the police a description of the car and the plate number and pointed in the direction which the individuals who had robbed him drove off. He was placed in the rear seat of the patrol vehicle and gave further details of the crime in Spanish to Officer Cedo, who spoke Spanish. Shortly thereafter Officer Durden testified the complainant’s vehicle was spotted and that he placed the dome lights of the patrol vehicle on while pursuing the complainant’s vehicle. The vehicle increased speed but was overtaken within a few blocks. Officer Durden further testified that both defendants were in the front seat, the defendant Jasper being on the driver’s side; defendant Smith in the process of exiting the vehicle when it was stopped. The officers exited their patrol vehicle with drawn weapons and ordered both defendants to lie face down on the sidewalk. At this point, Baez identified the defendants as the persons who allegedly robbed him and identified the vehicle as being his. The defendant Smith dropped some money on the ground which Officer Durden testified he picked up and placed in his pocket.
Police Officers Daniel Kiely (driver) and William Shannon (recorder), then assigned to the anti crime unit of the 46th Precinct, both in plain clothes were patrolling in an unmarked police car, when, at approximately 10:45 p.m., they received a radio transmission concerning a blue Chevrolet with a white top which was being pursued by a marked patrol car. Officer Kiely testified that, as his vehicle approached the 181st Street bridge, he could observe the flashing lights of the marked patrol car crossing the bridge. The anticrime unit vehicle followed this route and, when they arrived at 181st Street and Amsterdam Avenue, both officers observed that the blue Chevrolet had been stopped and the marked patrol car, with dome lights still on, was stopped directly behind it. At this point, both Officers Kiely and Shannon exited their unmarked vehicle and observed two uniformed officers (Durden and Cedo) with drawn weapons and the two defen *617 dants lying prone, face down on the sidewalk. Officer Kiely drew his weapon and both he and Officer Shannon approached the scene after Officer Shannon had checked the Chevrolet for additional occupants. As Officers Shannon and Kiely drew nearer to the scene where their fellow officers and the defendants were located, Officer Durden advised them that the defendants were suspects in a robbery involving the use of a gun. At this point, the defendant Smith was handcuffed, frisked by Officer Shannon and placed in the rear of the unmarked anticrime vehicle by Officers Shannon and Kiely. Officer Kiely sat in the rear of the unmarked vehicle with defendant Smith and Officer Shannon sat in the front seat.
Officer Shannon then turned around in the seat and advised defendant Smith that he was under arrest, that he (Shannon) was going to advise Smith of his rights, and that he wanted Smith to tell him if Smith understood each right as they were given to him. Officer Shannon then proceeded to advise Smith of his Miranda warnings from memory. Both officers testified that Smith indicated he understood his rights and that he wished to speak to the police. However, the officers agreed that defendant Smith was not advised if he did not have the funds to obtain his own attorney one would be provided without cost to him.
Officer Kiely then asked Smith if he was in the blue Chevrolet and Smith responded that he was. Smith then began to question why he was being arrested; that he did not know what was happening and that the arrest was a mistake. He further stated to Officer Kiely that he was at University Avenue and McCombs Road; that he knew the codefendant; that the codefendant offered him a ride to Manhattan and he accepted the offer.
During this time, a crowd of between 30-40 people began to gather. Also during this time, a sergeant’s marked patrol car arrived at the scene. A decision was made to remove both defendants to the 34th Precinct. Officers Kiely and Shannon removed Smith from the unmarked vehicle and placed him in the sergeant’s vehicle, which transported Smith to the 34th Precinct. After remaining *618 at the scene for a time, both officers also went to the 34th Precinct.
Upon their arrival at the 34th Precinct, the officers observed that the defendants were at the precinct. Smith asked Kiely if he could use the men’s room and Kiely and Shannon took him into the men’s room. While there, Smith again asked Kiely why he was being arrested and generally repeated his prior statements to the effect that it was a mistake.
While Smith was in the men’s room with Officers Kiely and Shannon, defendant Jasper was placed in a holding pen. He asked Officer Durden why he was there and at that point Officer Durden read him his Miranda warnings from the bottom of an arrest form. Defendant Jasper indicated that he understood his rights. He also stated that he was “dusted up”.
Upon leaving the men’s room, Smith was confronted by Jasper. Both defendants began to accuse the other of being the driver of the blue Chevrolet.
At this point, Francis Baez, the alleged victim of the robbery, was at the doorway to the room where the defendants and police officers were located. He asked the police if the^ found a gold chain which was allegedly taken during the course of the robbery. Officer Shannon then searched Smith and found, in Smith’s right rear pocket, a gold chain which was identified by Baez as being his gold chain/Smith then told the police, without being questioned, that it was not his chain and he did not know how it got into his pants pocket. Smith then stated that while he was lying on the ground, he felt someone go near his pants pocket and that Jasper must have put the chain into his pocket at that time.
Both officers testified that no threats had been made, no injuries observed, no evidence of intoxication was observed and no promises were made to the defendants.
On cross-examination, Officer Durden stated after reflection, that he took the phrase “dusted up” to mean that the defendant had used some “angel dust”. However, there was no evidence adduced at the hearing to indicate that Jasper was under the influence of any drugs. Indeed, *619 Officer Durden’s testimony revealed that Jasper appeared nervous (not unusual considering his predicament), but that aside from that he noticed nothing unusual about the defendant’s behavior or demeanor.
Shortly after the confrontation between the two defendants Jasper asked to make a phone call to a person whom he alleged to be his attorney and gave Durden a phone number. Durden called the number and a female answered. She told Durden that she was not an attorney but that she was a “counselor”. This was at approximately 11:30 p.m. In any event, there were no questions or statements taken from Jasper after the phone call other than pedigree information.
In arguing there was no probable cause to arrest defendants, defense counsel urged that there was no reliable informant in this case and that the information given to the police therefore did not amount to probable cause. The court rejects this claim as being specious at best. The police officers were faced with the report of a recent serious crime, description of the stolen vehicle and a plate number, a brief description of the perpetrators, and the direction in which the vehicle was going. The police traveled in the indicated direction, came upon the vehicle quickly and when they attempted to stop it the vehicle attempted to speed away. Moreover, the victim identified the vehicle as his and the defendants as the persons who robbed him. Certainly the police had ample probable cause to stop and detain the defendant in this situation and would be remiss in their duties had they not acted upon this information. (People v De Bout, 40 NY2d 210; CPL 140.50, subd 1.)
A more difficult problem is presented in regard to the statements made by the defendant Smith. From the testimony adduced at the hearing, it is clear that Smith was properly advised of his Miranda warnings except that he was not informed that if he could not afford an attorney, one would be appointed for him.
The authorities are divided on the effect of any deficiencies in the warnings given to a defendant. In People v Newson (68 AD2d 377), the court held that failure to give *620 the warning concerning assigned counsel was fatal to the admissibility of the statement in question. Clearly, the missing element is of importance in determining whether a defendant made a knowing and voluntary waiver of his rights.
However, of equal importance in this analysis is the well-established rule that the voluntariness of a custodial statement must be determined by an examination of the totality of the particular facts surrounding its making (Tanner v Vincent, 541 F2d 932). Upon such examination, a defendant’s constitutional rights may not be violated if, under the facts of a particular case “the admonitions accorded defendant were in substantial compliance with those mandated by law” (People v Congilaro, 60 AD2d 442, 449). In this regard it is important to note that: “[T]he words of Miranda do not constitute a ritualistic formula which must be repeated without variation in order to be effective. Words which convey the substance of the warning along with the required information are sufficient”. (United States v Vanterpool, 394 F2d 697, 698-699; see, also, United States v Lamia, 429 F2d 373, cert den 400 US 907; People v Tutt, 47 AD2d 911, affd 38 NY2d 1011; People v Congilaro, supra.) As Judge Gabrielli in his concurring opinion in People v Tutt (38 NY2d 1011, 1013, supra) pointed out: “It is sufficient that the preinterrogation admonitions mandated by Miranda be imparted in a manner sufficiently clear and comprehensible for the ordinary person to understand his rights (People v Swift, 32 AD2d 183, 187, cert den 396 US 1018 * * *).” Moreover, the rule is well established that: “In resolving these questions of the adequacy of the warning, we should give precedence to substance over form”. (United States v Lamia, supra, p 376.)
The facts before the court in the instant case reveal that both defendants were sufficiently advised of their rights prior to making the statements in question. (The warnings given to Jasper were read from the bottom of an arrest form. There is no question as to the sufficiency of these warnings.)
*621 There is no claim before this court that Smith was; in fact, indigent. The court will note that he is currently represented by retained counsel.
Of greater importance, however, is the fact that the record is totally devoid of any request on the part of Smith to speak with a lawyer prior to making any statements. Moreover, the statements made by these defendants were designed to be exculpatory.
It should also be noted that a Sandoval hearing was held before this court prior to the Huntley hearing. The facts revealed at that hearing showed that the defendant Jasper had approximately 19 arrests dating back to 1974, resulting in approximately six convictions. Although most convictions were pleas to violations, Jasper was convicted by a plea of guilty to criminal possession of a controlled substance in the third degree, a felony. He is currently awaiting sentencing. Smith has a criminal record dating back to 1972, with 10 or more arrests, with three or more convictions, one of which was a felony. Thus, both defendants have had a great deal of prior exposure to the criminal justice system. This type of exposure is a proper factor to consider in determining whether these defendants knowingly and voluntarily waived their rights. (People v Perry, 52 AD2d 963; People v Stanton, 54 AD2d 527.)
Based upon an examination of the totality of the facts surrounding the making of the statements in question (Tanner v Vincent, 541 F2d 932, supra), the court concludes that the People have satisfactorily proved beyond a reasonable doubt that the defendants knowingly waived their constitutional rights and voluntarily made the statements in question.
Accordingly, both defendants’ motion to suppress the statements is denied in all respects.