## (December 29, 1981)

■ THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v GARY LEWIS LEE, Respondent. — Order, Supreme Court, New York County (S. Levy, J.), entered December 8, 1980, suppressing certain postarrest statements made by the defendant, reversed, on the law and the facts, motion to suppress denied, and matter remanded for trial. At the beginning of his oral decision, the suppression court stated that, basically, it gave full credence to the testimony of the prosecution witnesses. However, that court expressed some doubts as to whether detective Fletcher had given all the *Miranda* warnings to defendant in the hospital. The court found that it was unnecessary to reach that question because, even if all the warnings had been given, the defendant was so agitated and excited that he did not voluntarily, intelligently and knowingly waive his rights. Although the court determined that defendant had been given his *Miranda* warnings on two subsequent occasions in the station house, it suppressed defendant's statements on those occasions since they were tainted by the impropriety of the first warning. Upon this record, we find as a fact that detective Fletcher gave defendant all his *Miranda* warnings in the hospital. At that time, defendant stated that he fully understood those warnings. There is no compelling evidence for this court to conclude that defendant did not fully understand the significance of his statements to the detective. While defendant may have been somewhat agitated and excited in the hospital, this would appear to be a normal reaction for a person who had just been arrested for a homicide. In view of this court's finding that the defendant intelligently waived his rights in the hospital, his subsequent statements made in the station house are free from taint and are also admissible. Concur — Murphy, P. J., Kupferman, Fein and Lynch, JJ.

Sandler, J., dissents in a memorandum as follows: In *Miranda v Arizona* (384 US 436), the United States Supreme Court set forth the dispositive rule with regard to the principal issue presented on this appeal (at p 475): "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. * * * This Court has always set high standards of proof for the waiver of constitutional rights, [citation omitted] and we re-assert these standards as applied to in-custody interrogation." Although accepting as truthful the testimony of the principal interrogating police officer with regard to the events leading to defendant's

inculpatory statements, the hearing Judge concluded that the People had failed, with regard to the first of these, to meet its "heavy burden" of proof — in this State proof beyond a reasonable doubt (*People v Valerius,* 31 NY2d 51) — that the defendant had "knowingly and intelligently waived" his constitutional rights. This factual determination is solidly supported by the evidence in this record. Although not addressed by the hearing Judge, the record discloses a separate, equally compelling reason for excluding the defendant's first admission. The defendant did not expressly waive his constitutional rights after the recital of the *Miranda* warnings and prior to his first admission. And the circumstances were singularly inappropriate for the court to infer such a waiver from his actions and words. Indeed, the evidence discloses a clear violation of *Miranda* principles when the interrogating detective, after administering the warnings and prior to any statement by the defendant, in effect urged the uncounseled defendant to waive his constitutional rights. (See *Miranda v Arizona, supra,* at pp 475, 476.) Finally, the hearing Judge suppressed the defendant's later statements on the essential finding that the accused had been so committed by the first invalidly secured statement that he had been effectively compelled to make the later statements. Although an arguably close question is presented with regard to the last statement, this aspect of the hearing court's ruling, clearly factual in character (see *People v Tanner,* 30 NY2d 102, 106), is also strongly supported by the record. On the evening of October 2, 1978, a badly beaten child, near death, was carried into St. Luke's Hospital by his mother, June Eleby, and her boyfriend, the defendant. Detective Fletcher, responding to the hospital after receiving this information, was told by the mother and that defendant that the child had been found in a battered condition after a period of abduction by some unknown woman. Thereafter, under intensive interrogation by the detective, the mother recanted the story, stated that the defendant had struck the child, that the defendant had wanted to tell the truth, and that she had persuaded him to go along with a false story she had concocted. Detective Fletcher then went to the emergency room in which the defendant was waiting. He testified: "From the moment I walked into the emergency room, when I walked over to him, I identified myself to him, said, 'My name is Detective Fletcher from the 5th Homicide Zone and you are under arrest for homicide and I want you to listen to what I am going to say.' I said, 'You have the right to remain silent and not to answer any of my questions. Do you understand?' There was a pause, then he answered 'Yeah.' Then I stated to him, 'Anything you do say can be used against you in a court of law.' His answer to me was, 'Homicide,' angrily. He looked at me, he looked at the wall. I told him, 'Listen to what I am telling you.' Then I stated to him, 'You got a right to counsel now or at any time in the future. Do you undersand?' 'A lawyer?' I said, 'Listen, just listen.' He was moving around in his seat, glared a few times. He looked at me a few times. Then I explained to him, 'If you cannot afford an attorney, one will be provided to you free of cost,' and he was shifting around. I said, 'Listen, Gary, you better listen to what I am saying to you.' 'Yeah.' And then I said to him, 'And if you don't have counsel available, you can wait, you can talk to one later on. You don't have to say anything to me, if you don't want to.' 'Yeah.'" The District Attorney then sought to ascertain whether, and to what extent, the detective had repeated the warnings. The detective answered: "I had to repeat myself during the rights. He had muttered, he had shifted around. * * * A. After he said, 'Homicide,' and after he stated, 'Lawyer,' I kept on telling him, 'Listen, just listen to what I am telling you. You have to listen.'" Finally, the detective identified two warnings that he had repeated to the defendant. The first was the warning that anything the defendant said could be used against him in a

court of law, to which the defendant had responded with the word "homicide." The second was that if the defendant could not afford a lawyer one would be provided for him. On cross-examination, detective Fletcher gave these additional details: "Q. You said he was muttering? A. Yes. Q. What kind of things was he muttering? A. Homicide, the lawyer. He stated things I didn't hear. Q. Rambling kinds of things? A. Yes. Q. Small words or long rambling? A. Short, muttering under his breath." After the defendant admitted striking the child, he was quickly taken to the 5th Homicide Zone office where, within 15 minutes after his first statement, the same detective read the *Miranda* warnings from a form, and the defendant made further admissions. The defendant was then asked to write down a statement of what occurred, which he did. Some three hours later, after a repetition of the *Miranda* warnings, the District Attorney took from the defendant a stenographically recorded statement in which the defendant again inculpated himself. When the evidence is considered as a whole, the substantial possibility is clearly presented that the defendant, shocked to learn that he was under arrest for homicide, was so absorbed with the thoughts and feelings to which this announcement led that he did not listen in an understanding way to some or all of the *Miranda* warnings. That certainly was the conclusion reached by a hearing Judge with large and diversified experience in criminal matters, and I see no justification for an appellate determination that this conclusion was unreasonable or against the weight of evidence. The interrogating detective himself clearly shared in part the concern that led to the hearing Judge's conclusion. This caused him repeatedly to urge the defendant to listen to him and to repeat two of the warnings. The conclusion embodied in this court's memorandum necessarily rests upon the dubious hypothesis that absolute reliance may be placed on the detective's judgment as to precisely when the defendant was listening in a comprehending way and when he was not. The untenability of this view is readily disclosed by an examination of the record. Thus it was in response to the second *Miranda* warning that the defendant responded with the word "homicide," clearly signaling that his mind was still preoccupied with the officer's preliminary statement that he was under arrest. This properly led the officer to repeat the second *Miranda* warning but it did not occur to the officer, although the possibility is apparent, that the defendant may well not have listened in an understanding way to the first of the *Miranda* warnings notwithstanding the fact that he had responded affirmatively when asked if he understood that warning. The same analysis applies with regard to the later occasion when the witness responded with the word "lawyer." The substantial factual basis for the hearing court's conclusion is convincingly demonstrated by the detective's testimony on cross-examination in which significant details were given that were absent from his direct testimony. Thus he testified that the defendant was "muttering" words like "homicide," "lawyer," that the defendant said things the detective did not hear, "rambling kinds of things," "short, muttering under his breath." Nothing in this testimony limits the "muttering" precisely to the two occasions on which the two *Miranda* warnings were given that the detective felt obliged to repeat. As to the words the detective could not hear, it is a reasonable inference that, consistent with the words he did hear, they were expressions of a person whose mind and feelings were preoccupied with the fact that he had been arrested for a homicide and not with the *Miranda* warnings. It is no answer to the specific evidence presented by this record to say that most defendants under arrest are agitated and upset. When the record is examined against the People's heavy burden of proof, I see no basis for disturbing the factual determination of the hearing court unless this court were to adopt the view that *Miranda* requires only a

mechanical ritual of reading rights and not proof beyond a reasonable doubt that a defendant has "knowingly and intelligently waived" his constitutonal rights. An equally compelling reason for suppressing the first of the defendant's inculpatory statements appear in the detective's report of what occurred after he had given the *Miranda* warnings and before the defendant made his first admission. "Q. After you had attempted to advise him of his rights, did he make a statement to you? A. I wouldn't let him. He attempted to. After reading him his rights, after verbally reading to him his rights, he went to say something and I stopped him and told him that I knew what had happened. I told him that June had told me that she had made up the story and he said to me, 'Did she say that, did she tell you that?' I said 'Yes, she said that you wanted to tell us.' So his manner changed. 'I asked you, did you punch Keith?' " In *Miranda v Arizona,* the Supreme Court said the following (at pp 475, 476): "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. * * * Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." It is clear that the defendant never said expressly that he wished to make a statement and did not want an attorney, the procedure clearly preferred in *Miranda.* Nor do the circumstances suggest that this is the unusual case, alluded to in *North Carolina v Butler* (441 US 369, 373), in which, notwithstanding the contrary presumption and the prosecutor's "great" burden, waiver may be inferred from the actions and words of the interrogated person. For the detective's testimony discloses a clear violation of *Miranda* principles. The detective's statement to the defendant that he knew from the mother what had happened and that she had admitted concocting the original story, which resulted in a change in the defendant's manner, was undoubtedly a sincere effort to persuade the defendant to abandon the false story previously told and to now acknowledge what the detective believed to be the truth. This would have been appropriate if told to the defendant after the defendant had adequately expressed a desire to waive his constitutional rights. Coming when it did, after the warnings had been given but before the defendant had expressly or impliedly waived his constitutional rights, the officer's statement amounted to an argument to the uncounseled defendant to waive his constitutional right not to answer questions without counsel being present. As was said in a recent case presenting a comparable issue: "The defendant's inculpatory statement, coming immediately after [the] admonition, was the result of an impermissible intrusion on the defendant's right to make an unpressured and uninfluenced election whether he should or should not waive his constitutional rights." (*People v Campbell,* 81 AD2d 300, 304.) Having determined that the defendant's hospital admissions were secured in violation of his constitutional rights, the hearing Judge was surely correct in his determination that the two immediately following statements by the defendant in the station house, one oral and one handwritten, must likewise be suppressed. The record discloses that the first of these station house statements, the oral one, was secured during an interrogation beginning within 15 minutes after the hospital admission, that the same detective conducted the interrogation, and that he prodded the defendant with a reminder of what had been said at the hospital. The statement written by the defendant in response to the officer's request followed immediately thereafter. These circumstances clearly disclosed the "single continuous chain of events" which the Court of Appeals in *People v Chapple* (38

NY2d 112, 114) held to require suppression of later inculpatory statements. As to the District Attorney's stenographically recorded statement some three hours later, a somewhat closer question is presented. This issue is perhaps most usefully analyzed in terms of the standard formulated by the Court of Appeals in *People v Tanner* (30 NY2d 102) which appears to have been the principle relied on by the hearing Judge. The Court of Appeals said in *Tanner* (at p 106): "Whether an accused believes himself so committed by a prior statement that he feels bound to make another, depends on his state of mind which is a fact question." In *Tanner,* the hearing Judge had determined the issue adversely to the defendant and the Court of Appeals held that factual determination sustainable, relying in part on the circumstance that the defendant in *Tanner,* testifying at the suppression hearing, had not claimed that he felt bound by his prior statement to make the later one in issue. Significantly in *Chapple (supra,* p 114) the Court of Appeals observed with regard to its decision in *Tanner:* "The credibility of that defendant was for the lower courts to assess; we did not review their conclusions." In this case, by the time the defendant was questioned by the District Attorney, he had already made an incriminating admission in the hospital, had followed that by a further inculpatory statement in the station house and then had inculpated himself in a handwritten statement. The interrogating officer involved in these earlier statements was also present during the defendant's interrogation by the District Attorney. It was surely not unreasonable for the hearing Judge to have concluded from the foregoing that the defendant believed himself, at the time he made the last statement, to be so committed by his previous admissions that he felt "bound to make another." (See *People v Johnson,* 64 AD2d 907, affd 48 NY2d 674; *People v Newson,* 68 AD2d 377; *People v Johnson,* 79 AD2d 617; *United states ex rel. Stephen J. B. v Shelly,* 430 F2d 215; but cf. *People v Glover,* 58 AD2d 814.) For the reasons set forth above, the order of the Supreme Court, New York County (Levy, J.), entered December 8, 1980, suppressing postarrest statements by the defendant, should be affirmed.