■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RENEE RONDAN, Appellant.—Appeal by defendant from a judgment of the Supreme Court, Kings County (De Lury, J.), rendered May 18, 1982, convicting him of murder in the second degree, upon his plea of guilty, and imposing sentence.

Judgment affirmed.

On October 13, 1980, at about 8:00 P.M., two men committed a robbery in a grocery store located at 495 Atkins Avenue in the East New York section of Brooklyn. During the course of the robbery, Antonio Pena, the owner of the store, was fatally shot.

On the morning of October 18, 1980, New York City Police Detective Jerry Maglio received information implicating defendant, Renee Rondan, in the crime. Thereupon, Detective Maglio proceeded to the home of defendant's mother, Viola Rondan. Detective Maglio advised Mrs. Rondan that her son was wanted for questioning about a homicide. Mrs. Rondan told Detective Maglio that defendant was at her daughter's residence. Detective Maglio and Mrs. Rondan went to the home of Rebecca Rondan, defendant's sister, arriving at about 8:00 or 9:00 A.M. Rebecca permitted them to enter her residence and led Detective Maglio to a room where defendant was sleeping. Detective Maglio awakened defendant, identified himself as a detective investigating a homicide which had taken place in a grocery store, and gave defendant his *Miranda* warnings. Defendant indicated he understood his rights. Then, with defendant's mother seated in the room, Detective Maglio proceeded to question defendant. The detective later testified: "I then told him that his mother was a very religious individual. She attended church and was very religious. I told him it would be best not to lie to his mother and tell her the truth. He turned to his mother, seated in the room and told her he didn't mean to kill the man. He went in to do a stick-up or with an individual named Hector Ramos. During the course of the robbery, the gun accidentally discharged, killing the man."

Defendant also stated that his accomplice had supplied the weapons and he had received $50 as his share of the proceeds from the robbery.

Defendant agreed to accompany Detective Maglio to the 75th Precinct if his mother came along with them. Detective

Maglio agreed and then transported defendant, Mrs. Rondan and Rebecca to the precinct. At the precinct defendant repeated his prior statement in the presence of Detective Maglio, Mrs. Rondan and Rebecca.

At approximately 11:15 A.M., New York City Police Detective Ronald Schnatter, who was responsible for the investigation, arrived at the precinct. Upon Detective Schnatter's arrival (which occurred about two hours after Detective Maglio's interview of defendant), Detective Maglio apprised him of defendant's earlier statements.

Detective Schnatter entered the interview room where defendant, Mrs. Rondan and Rebecca were seated. Detective Schnatter identified himself and, reading from a piece of paper, advised defendant of his *Miranda* rights. Defendant indicated he understood these rights, and, having these rights in mind, wished to speak with the detective. Thereupon, defendant proceeded to make a third inculpatory statement which Detective Schnatter reduced to a three-page written statement. The statement was reviewed by defendant, read back to him, and signed on each page by defendant, his mother and his sister. Detective Maglio took no part in this interrogation.

Later that evening, Assistant District Attorney Carlos Matir arrived at the precinct. Detective Schnatter provided Matir with defendant's written statement and with the background on the case. Matir readvised defendant of his constitutional rights and at about 8:44 P.M. he took a videotaped statement in which defendant again incriminated himself. Matir also took statements from Mrs. Rondan and Rebecca which were transcribed by a stenographer and in which they each stated that defendant had admitted his participation in the robbery and homicide.

On these facts adduced at the *Huntley* hearing, Criminal Term denied suppression of defendant's inculpatory statements on the grounds, *inter alia,* that the *Miranda* warnings given defendant at the outset were sufficient and defendant had made a knowing, intelligent and voluntary waiver of those rights; that the first statement made was therefore not tainted; and that even if defendant's initial interrogation was improper, there was a definite, pronounced break in the questioning such that defendant's later statements, made after the *Miranda* warnings were administered and a knowing and voluntary waiver was elicited thereto, cured the taint, if any, of the initial interrogation.

Defendant contends on appeal that the *Miranda* warnings administered prior to the initial interrogation were insufficient to alert him that his right to counsel attached immediately. Defendant concedes that his challenge to this narrow aspect of the constitutionally mandated admonitions was not raised at the *Huntley* hearing and, therefore, has not been preserved for review *(see, People v Tutt,* 38 NY2d 1011). The People have not been afforded an evidentiary opportunity to meet the theory of defendant's case first advanced on appeal. In any event, the record supports Criminal Term's finding that defendant's initial statement was not the product of coercion, and that the defendant had been properly advised as to his constitutional rights.

Even assuming that the initial interrogation was conducted in the absence of a complete advisement of defendant's constitutional rights, the prior statement did not compromise the voluntariness of defendant's later inculpatory remarks. As the United States Supreme Court recently stated: "We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights" *(Oregon v Elstad,* 470 US 298, —, 105 S Ct 1285, 1296).

The Supreme Court's holding in *Elstad (supra)* is entirely consistent with the case law authority in this State. In *People v Chapple* (38 NY2d 112, 115) the Court of Appeals determined that later *Miranda* warnings will cure an initially improper interrogation if "there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning".

In the case at bar, the separate interrogations were conducted during the same day. However, the interrogations were separated by a span of over two hours and were conducted by different interrogators. Detective Maglio, who delivered the allegedly defective warnings, took no part in the subsequent questioning of defendant. In addition, at no time during the day in question was defendant separated from the comfort and support of his mother and sister. Nor was defendant hand-

cuffed. Under these circumstances, even if we were to find the initial statement made by defendant to be subject to suppression, the later inculpatory statements were sufficiently attenuated and, therefore, would be properly admissible *(see, People v Glover,* 58 AD2d 814; *cf. People v Johnson,* 79 AD2d 617; *People v Newson,* 68 AD2d 377). Mollen, P. J., Thompson, Niehoff and Eiber, JJ., concur.